**<u>Exhibit A</u>**

**(Successful Bidder APA)**

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

dated as of June 20, 2022

by and among

PAGE SOUTHERLAND PAGE, INC., or its designee(s),

as Buyer,

and

EYP GROUP HOLDINGS, INC.

and

ITS SUBSIDIARIES AND AFFILIATES SIGNATORY HERETO

as Sellers

# TABLE OF CONTENTS

Page

**ARTICLE 1    DEFINITIONS** ................................................................................. 1

1.1    Defined Terms ........................................................................................... 1
1.2    Interpretation ........................................................................................... 17

**ARTICLE 2    ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES** ............. 18

2.1    Assets to be Acquired ............................................................................. 18
2.2    Liabilities to be Assumed by Buyer ...................................................... 18
2.3    Excluded Liabilities ............................................................................... 18
2.4    Wrong Pockets ........................................................................................ 18
2.5    Assumption and Assignment of Contracts and Leases ...................... 18

**ARTICLE 3    CLOSING; PURCHASE PRICE** ............................................................ 20

3.1    Closing; Transfer of Possession; Certain Deliveries .......................... 20
3.2    Consideration ........................................................................................... 22
3.3    Allocation of Purchase Price ................................................................ 22

**ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF SELLERS** ................... 23

4.1    Organization ............................................................................................ 23
4.2    Authorization of Transaction ................................................................ 23
4.3    Governmental Consents ........................................................................ 23
4.4    No Conflicts ............................................................................................. 23
4.5    Acquired Assets ...................................................................................... 24
4.6    Litigation; Orders ................................................................................... 24
4.7    Tangible Personal Property ................................................................... 24
4.8    Employment Matters .............................................................................. 24
4.9    Compliance with Laws; Permits ........................................................... 26
4.10   Trade Controls ........................................................................................ 26
4.11   Anti-Bribery Laws .................................................................................. 26
4.12   Contracts and Leases ............................................................................. 27
4.13   Real Property .......................................................................................... 27
4.14   Intellectual Property .............................................................................. 27
4.15   Brokers' Fees and Commissions .......................................................... 28
4.16   Financial Statements ............................................................................. 29
4.17   Tax Matters ............................................................................................. 29
4.18   Employee Benefits Matters ................................................................... 30
4.19   Absence of Changes ............................................................................... 32
4.20   Exclusive Representations and Warranties .......................................... 32

**ARTICLE 5    REPRESENTATIONS AND WARRANTIES OF BUYER** ...................... 32

5.1    Organization ............................................................................................ 32
5.2    Due Authorization, Execution and Delivery; Enforceability ............. 32
5.3    Governmental Approvals ....................................................................... 33
5.4    No Conflicts ............................................................................................. 33

| | | |
|---|---|---|
| 5.5 | Sufficiency of Funds | 33 |
| 5.6 | Adequate Assurances Regarding Executory Contracts | 33 |
| 5.7 | Exclusive Representations and Warranties | 33 |
| 5.8 | No Outside Reliance | 34 |

**ARTICLE 6    COVENANTS OF THE PARTIES** .................................................**34**

| | | |
|---|---|---|
| 6.1 | Conduct of Business Pending the Closing | 34 |
| 6.2 | Access | 35 |
| 6.3 | Public Announcements | 36 |
| 6.4 | Tax Matters | 36 |
| 6.5 | Commercially Reasonable Efforts | 37 |
| 6.6 | Further Assurances | 37 |
| 6.7 | Bankruptcy Court Matters | 38 |
| 6.8 | Cure Costs | 39 |
| 6.9 | Preservation of Books and Records | 39 |
| 6.10 | Notification of Certain Matters | 40 |
| 6.11 | Confidentiality | 40 |
| 6.12 | Employees | 41 |
| 6.13 | Bulk Transfer Laws | 42 |
| 6.14 | Collection of Accounts Receivable | 42 |
| 6.15 | Use of Name and Marks | 42 |
| 6.16 | No Successor Liability | 42 |

**ARTICLE 7    CONDITIONS TO OBLIGATIONS OF THE PARTIES** .................**43**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to Obligations of Buyer | 43 |
| 7.2 | Conditions Precedent to the Obligations of Sellers | 44 |
| 7.3 | Frustration of Conditions Precedent | 44 |

**ARTICLE 8    TERMINATION** ................................................................**44**

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 44 |
| 8.2 | Consequences of Termination | 46 |

**ARTICLE 9    MISCELLANEOUS** ..........................................................**46**

| | | |
|---|---|---|
| 9.1 | Expenses | 46 |
| 9.2 | Assignment | 46 |
| 9.3 | Parties in Interest | 47 |
| 9.4 | Notices | 47 |
| 9.5 | Choice of Law | 48 |
| 9.6 | Entire Agreement; Amendments and Waivers | 48 |
| 9.7 | Counterparts; Facsimile and Electronic Signatures | 48 |
| 9.8 | Severability | 48 |
| 9.9 | Headings | 49 |
| 9.10 | Exclusive Jurisdiction; Specific Performance | 49 |
| 9.11 | WAIVER OF RIGHT TO TRIAL BY JURY | 50 |
| 9.12 | Survival | 50 |
| 9.13 | Computation of Time | 50 |
| 9.14 | Time of Essence | 50 |

9.15    Non-Recourse ........................................................................................................50
9.16    Disclosure Schedules ...........................................................................................50
9.17    Sellers' Representative; Dealings Among Sellers ................................................51
9.18    Mutual Drafting ...................................................................................................51
9.19    Fiduciary Obligations...........................................................................................51

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of June 20, 2022 (the "Agreement Date"), is by and among EYP Group Holdings, Inc., a Delaware corporation ("EYP"), and each of EYP's Subsidiaries and Affiliates listed on the signature pages hereto (together with EYP, "Sellers" or the "Company", and each, a "Seller") and  Page Southerland Page, Inc., a Delaware corporation, or its designee(s) ("Buyer").  Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS**, Sellers engage in the business of providing architectural and engineering design services, and related consulting, to public and private clients (the "Business");

**WHEREAS**, on or about April 24, 2022, Sellers (collectively, the "Debtors"), commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing petitions for relief in the Bankruptcy Court (the date of such filing, the "Petition Date");

**WHEREAS**, Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase, the Acquired Assets as of the Closing, and Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing, in each case upon terms and subject to the conditions set forth hereinafter (including the Auction);

**WHEREAS**, the board of directors, including the independent directors, of EYP, and the boards of directors or other governing bodies of the other Sellers have each determined that it is advisable and in the best interests of Sellers and their creditors to consummate the Transactions, and have approved this Agreement;

**WHEREAS**, Sellers intend to seek the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court approving the Transactions contemplated by this Agreement and authorizing Sellers to consummate the Transactions upon the terms and subject to the conditions set forth herein and in the Bidding Procedures Order and the Sale Order (each as defined below) to be entered in the Chapter 11 Cases under sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code.

**NOW**, **THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Acquired Assets" shall mean all properties, assets, interests and rights of every nature, tangible and intangible of Sellers (real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers) Relating to the Business, and in any event, including the following assets of Sellers, except the Excluded Assets shall not be Acquired Assets:

(a)    all accounts and notes receivable of the Business (whether current or non-current), including unbilled revenue under the Assumed Contracts, and all causes of action specifically pertaining to the collection of the foregoing, except as set forth on Schedule 1.1(a);

(b)    subject to Section 2.5, all rights of Sellers under the Assumed Contracts and Assumed Leases, including Sellers' rights with respect to the Leased Real Property subject to the Assumed Leases;

(c)    subject to the right of Sellers to retain copies (at Sellers' expense and subject to Section 6.9), all Acquired Business Information, including customer lists, customer data, customer contact information, correspondence with present or prospective customers or suppliers, mailing lists, distribution lists, and supplier lists, in the possession or control of any Seller and whether in hard or electronic format;

(d)    all intangible personal property (other than Intellectual Property) owned by Sellers, including all goodwill Relating to the Business, the Acquired Assets and/or the Assumed Liabilities;

(e)    all tangible assets, including equipment, machinery, furniture, supplies, computer hardware, data networks, servers, communication equipment, software, discs, stored data, raw materials, work in progress, finished goods, and other tangible personal property Relating to the Business;

(f)    to the extent transferrable, all rights of Sellers to refunds, reimbursements, promotional allowances, vendor rebates and similar items, all warranties, express or implied, received from third parties, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature relating to the Acquired Assets or the Assumed Liabilities;

(g)    all prepaid expenses of Sellers relating to any of the Assumed Contracts or Assumed Leases, including deposits, security deposits, merchant deposits, prepaid rent and prepaid expenses;

(h)    to the extent transferable, all Intellectual Property owned or licensed by any Seller Relating to the Business (the "Transferred Intellectual Property") and all evidence of such Transferred Intellectual Property which is in any Seller's possession, custody or control;

(i)    to the extent transferable and assignable, Sellers' interest in all licenses, License Agreements, and Licensed Software;

(j)    all Permits Relating to the Business and all pending applications for such Permits, but only to the extent transfer or assignment of such Permits or such applications to Buyer is permitted by Law (collectively, the "Acquired Permits");

2

(k)      all Avoidance Actions; provided that neither the Buyer, nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an action based on, assert, sell, convey, assign or file any claim that relates to the Avoidance Actions;

(l)      to the extent transferable, the Benefit Plans identified on Schedule 1.1(l) to the Disclosure Schedules (collectively, "Assumed Benefit Plans"), including, for the avoidance of doubt, that certain Executive Nonqualified "Excess" Plan pursuant to the Adoption Agreement dated as of September 1, 2011, as thereafter amended (the "Excess Plan"), and any contributions or pending contributions to the Assumed Benefit Plans held or to be held by or on account of Sellers;

(m)      to the extent transferable, the insurance policies and binders of any Seller set forth on Schedule 1.1 (m) to the Disclosure Schedules, including all rights, benefits and proceeds under or arising out of such insurance policies, Relating to the Business or any of the Acquired Assets or Assumed Liabilities (but excluding any returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies) (the "Assumed Insurance Policies");

(n)      all insurance proceeds received by Sellers (whether before or after the Closing Date) with respect to Acquired Assets or Assumed Liabilities;

(o)      any loss reserves held by Sellers on account of any Assumed Liabilities;

(p)      the capital stock of the Subsidiaries of EYP set forth on Schedule 1.1(p) ("Acquired Capital Stock") that are not debtors (as defined in 11 U.S.C. § 101(13)) on the Closing Date;

(q)      all organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to any Seller's organization, maintenance, existence, and operation, in each case relating solely to the Sellers which capital stock constitutes Acquired Capital Stock and/or the Joint Venture Interests; and

(r)      to the extent transferable, the Joint Venture Interests.

"Acquired Business Information" shall mean all books, financial information, records, files, ledgers, documentation, instruments, research, papers, data, telephone numbers Related to the Business, websites and URLs Related to the Business, social media accounts, business plans, litigation files, credit information, cost and pricing information, marketing materials and information, sales or technical literature or similar information that, in each case, is in the possession or control of any Seller and, in each case, is Relating to the Business, including, equipment records, files and assignment documentation pertaining to existence, availability, registrability or ownership of the Company's Intellectual Property and documentation of the development, conception or reduction to practice thereof; provided that Acquired Business Information shall not include any information (i) that requires consent of a third-party for transfer

hereunder, unless such consent is obtained (including pursuant to the Sale Order), or (ii) that if transferred hereunder would violate any Law.

"<u>Acquired Capital Stock</u>" shall have the meaning specified within the definition of "Acquired Assets."

"<u>Acquired Permits</u>" shall have the meaning specified within the definition of "Acquired Assets."

"<u>Affiliate</u>" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"<u>Agreement</u>" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedules, in each case as amended, restated, supplemented or otherwise modified from time to time.

"<u>Agreement Date</u>" shall have the meaning specified in the preamble.

"<u>Allocation</u>" shall have the meaning specified in <u>Section 3.3</u>.

"<u>Alternative Transaction</u>" shall mean (i) the approval by the Bankruptcy Court of a sale or sales of a material portion of the Acquired Assets, or the equity interests in one or more Sellers and/or Affiliates or Subsidiaries of any Seller, to a Person other than Buyer, and (ii) the filing of a plan of reorganization or liquidation that does not contemplate the sale of the Acquired Assets to Buyer in accordance with the terms hereof.

"<u>Anti-Bribery Laws</u>" shall have the meaning specified in <u>Section 4.11</u>.

"<u>Assumed Contracts</u>" shall have the meaning specified in <u>Section 2.5(a)</u>.

"<u>Assumed Insurance Policies</u>" shall have the meaning specified in <u>Section 1.1(m)</u>.

"<u>Assumed Leases</u>" shall have the meaning specified in <u>Section 2.5(a)</u>.

"<u>Assumed Liabilities</u>" shall mean the following Liabilities:

      (a)    all Liabilities of Sellers under each of the Assumed Contracts, including billing in advance and accrued accounts payable due to Sellers' consultants, in each case whether arising prior to, from, or after the Closing Date;

      (b)    all Liabilities of Sellers under each of the Assumed Leases, whether arising prior to, from, or after the Closing Date;

4

(c)     all Liabilities related to Property Taxes, or any other Taxes, imposed upon or assessed directly against the Acquired Assets, to the extent arising due to operation of the Business or ownership of Acquired Assets from and after the Closing Date;

(d)     all Liabilities related to client prepayments and overpayment, refunds, credits, reimbursements and related adjustments with respect to any Assumed Contract;

(e)     all Liabilities related to Transfer Taxes related to the Transaction, solely to the extent the total amount of such Liabilities does not exceed $25,000.00;

(f)     all Liabilities, to the extent arising from and after the Closing, with respect to or relating to the ownership or operation of any of the Acquired Assets;

(g)     all accrued and unused vacation hours, sick time, or other paid time off of the Transferred Employees accrued in the Ordinary Course of Business and identified in the schedules provided by Sellers pursuant to Sections 4.8(c) and (d);

(h)     all Liabilities with respect to the Transferred Employees as identified in the schedules provided by Sellers pursuant to Sections 4.8(c)(ii);

(i)     all Liabilities relating to the Assumed Benefit Plans;

(j)     all Liabilities related to the Incentive Plan;

(k)     all Liabilities related to the Assumed Insurance Policies;

(l)     all Liabilities under the WARN Act related to the Transactions solely to the extent arising due to Buyer's breach of Section 6.12 below;

(m)     all Liabilities incurred as a result of performance of Services by or on behalf of the Company under the Transition Services Agreement, subject to the terms of the Transition Services Agreement;

(n)     all Cure Costs, which shall be payable only when an Assumed Contract or Assumed Lease is assumed and assigned pursuant to Section 2.5; and

(o)     all Liabilities relating to completed or nearly completed client projects as set forth on Schedule 1.1(o); provided, however, the Liabilities identified on Schedule 1.1(o) shall constitute Assumed Liabilities solely in the event that the Sale Order determines that the insurance policies and proceeds thereunder identified on Schedule 1.1(o) with respect to each Liability set forth on Schedule 1.1(o) are Acquired Assets.

"Auction" shall have the meaning set forth in the Bidding Procedures.

"Audited Financial Statements" shall have the meaning specified in Section 4.16.

"Avoidance Actions" shall mean any and all claims for avoidance and recovery of any Seller under section 547 of the Bankruptcy Code relating to the Acquired Assets or Assumed

Liabilities or which may be asserted against counterparties to any Assumed Contract or Assumed Lease. Avoidance Actions shall further include any cause of action that could be asserted under section 548 of the Bankruptcy Code and any applicable state fraudulent transfer relating to the Acquired Assets or Assumed Liabilities or which may be asserted against counterparties to any Assumed Contract or Assumed Lease specifically under a theory that one of the Debtors paid an obligation of another one of the Debtors and thus did not receive reasonably equivalent value.

"Back-Up Bidder" shall have the meaning specified in Section 6.7(g).

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075.

"Benefit Plan" shall mean any employee benefit plan (including as defined in Section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, stock purchase, stock option or other equity or equity-linked compensation, disability, death benefit, hospitalization, medical, dental, life, employment (other than any offer letter or employment agreement that is terminable "at will" without the payment of severance), retention, change in control, termination, severance, separation, vacation, sick leave, holiday pay, paid time off, leave of absence, fringe benefit, compensation, incentive, insurance, welfare or any similar plan, program, policy, practice, agreement or arrangement (including any funding mechanism therefor), written or oral, whether or not subject to ERISA, and whether funded or unfunded, in each case that is adopted, sponsored, maintained, entered into, contributed to, or required to be maintained or contributed to, by any Seller for the benefit of any Employee, or pursuant to or in connection with which any Seller could have any Liabilities in respect of any Employee or beneficiary of any Employee.

"Bidding Procedures" shall mean the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order,  attached hereto as Exhibit A.

"Bidding Procedures Motion" shall mean D.E. 12 filed in the Chapter 11 Cases.

"Bidding Procedures Order" shall mean the Order of the Bankruptcy Court approving the Bidding Procedures in the Chapter 11 Cases.

"Bill of Sale and Assignment and Assumption Agreement" shall mean a bill of sale and assignment and assumption agreement to be entered into by Sellers and Buyer concurrently with the Closing, substantially in the form of Exhibit B.

 "Business" shall have the meaning specified in the recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Material Adverse Effect" shall mean a material adverse effect on the ability of Buyer to consummate the Transactions.

"Chapter 11 Cases" shall have the meaning specified in the recitals.

"Claim" shall mean all charges, proceedings, actions, claims (including administrative claims), counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Closing Working Capital" means, in each case generated from and by the Business prior to Closing, (a) all accounts receivable of Sellers under the Assumed Contracts net of any allowance for uncollectable accounts receivable (assessed consistent with historical practice) *less* (b) any outstanding accounts payable, determined as of 12:00 a.m. prevailing Eastern Time on the Closing Date.

"Closing Working Capital Target" means an average of the Closing Working Capital for the latest available trailing 12 months.

"Closing Purchase Price Adjustment" shall mean (i) $50,000 credit for prepaid expenses *plus* (ii) unbilled revenue *plus* (iii) accounts receivable for billing in advance *plus* (iv) any payroll obligations paid by the Company on June 30, 2022, *minus* (v) billing in advance *minus* (vi) accrued consultants payable, in each case of (ii) through (v) under the Assumed Contracts, *minus* (vii) the aggregate unpaid amount under the Excess Plan, *minus* (viii) the aggregate unpaid amount under the Incentive Plan, in each case determined as of 12:00 a.m. prevailing Eastern Time on the Closing Date.

"Code" shall mean the Internal Revenue Code of 1986, as amended, together with the Treasury Regulations promulgated thereunder.

"Company" shall have the meaning specified in the recitals.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated July 21, 2021, between the Company and Ault Global Holdings, Inc. (n/k/a BitNile Holdings, Inc.) and that certain Nondisclosure Agreement, dated as of May 19, 2021, between Page Southerland Page, Inc. and EYP, Inc.

"Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

7

"<u>Contract</u>" shall mean any contract, agreement, indenture, note, bond, loan, instrument, conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property (other than any Leases).

"<u>Cure Costs</u>" means all amounts required to be paid pursuant to section 365(b) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts and Assumed Leases, or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment of the Assumed Contract and Assumed Leases.

"<u>Debtors</u>" shall have the meaning specified in the recitals.

"<u>Delayed Contracts</u>" shall have the meaning specified in <u>Section 2.5(e)</u>.

"<u>DIP Order</u>" shall mean the interim and final orders entered by the Bankruptcy Court approving the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Party, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief.*

"<u>Disclosure Schedules</u>" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"<u>Employees</u>" shall mean all individuals, whether or not actively at work as of the date hereof, who are employed by any Seller, including such employees who have been furloughed or are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"<u>ERISA Affiliate</u>" of a Person means any Person, trade or business that is or has been a member of a controlled group of organizations required to be treated as a single employer (within the meaning of Sections 414(b), (c), or (m) of the Code), with such Person or is required to be aggregated with another such Person under Section 414(o) of the Code or, with respect to a single employer plan, is under "common control" with another such Person, within the meaning of Section 4001(a)(14) or 4001(b)(1) of ERISA, or any regulations promulgated or proposed under any of the foregoing Sections.

"<u>Excluded Assets</u>" means all properties, assets, interests, and rights of the Sellers other than the Acquired Assets, including:

      (a)     all cash and cash equivalents;

      (b)     all bank accounts;

(c)      all security deposits and any other deposits held by landlords, vendors, trade creditors, or any other party, except with respect to Assumed Contracts and Assumed Leases or Related to the Acquired Assets, and, for the avoidance of doubt, all cash in the Debtors' adequate assurance account relating to utilities under section 366 of the Bankruptcy Code.

(d)      Excluded Contracts and Excluded Leases;

(e)      all prepaid expenses related to Excluded Contracts and Excluded Leases;

(f)      capital stock and other equity interests of each of the Sellers except for the Acquired Capital Stock and Joint Venture Interests;

(g)      all Claims of Sellers or their respective estates against any Person of every kind and description related to Excluded Assets, including the Persons set forth on Schedule 1.1(a), and including any other current and former Representative or Insider (as defined in Section 101 of the Bankruptcy Code) of Sellers;

(h)      all current and prior director and officer insurance policies of Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, arising out of actions taking place prior to the Closing Date;

(i)      all rights of Sellers to the warranties, express or implied, and licenses granted by any third party related to any Excluded Assets;

(j)      all Personally Identifiable Information, including any credit card numbers or related customer payment source, or social security numbers;

(k)      all Tax assets, and any rights to Tax refunds and Claims related thereto, to the extent related to any Excluded Asset or Excluded Liability, or any period prior to Closing, but excluding any rights to Tax refunds and Claims related thereto for any Taxes paid by Buyer pursuant to this Agreement or otherwise;

(l)      all Intellectual Property except for the Transferred Intellectual Property;

(m)      all Permits except for the Acquired Permits;

(n)      all assets not Relating to the Business;

(o)      all Benefit Plans which are not Assumed Benefit Plans;

(p)      all insurance policies which are not Assumed Insurance Policies;

(q)      all (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to any Seller's organization, maintenance, existence, and operation, in each case relating solely to the Sellers which capital stock does not constitute an

Acquired Capital Stock; (ii) books and records, correspondence or communications to the extent related to (A) Taxes paid or payable by the Sellers, (B) any claims, obligations or liabilities not included in Assumed Liabilities, or (C) this Agreement, any Transaction Documents or the negotiation or consummation of the Transactions (and including any attorney-client privilege associated with any of the items described in the preceding clauses (A), (B) or (C)); and

      (r)     subject to the terms of the Transition Services Agreement, all assets not transferrable pursuant to applicable Law or terms of this Agreement.

"Excluded Contracts" shall mean all Contracts other than Assumed Contracts.

"Excluded Leases" shall mean all Leases other than Assumed Leases.

"Excluded Liabilities" shall mean all Liabilities of Sellers other than Assumed Liabilities, including:

      (a)     subject to the terms of the Transition Services Agreement, all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions, except those arising under the Transition Services Agreement;

      (b)     all Liabilities relating to the EYP Employee Stock Ownership Plan;

      (c)     all Liabilities to any broker, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating to the transactions contemplated by this Agreement for which any Seller is responsible;

      (d)     all Liabilities exclusively Relating to or primarily arising out of an Excluded Asset; and

      (e)     all Liabilities set forth on Schedule 1.1(e).

"Financial Statements" shall have the meaning specified in Section 4.16.

"FIRPTA Affidavit" shall mean an affidavit of a Seller (or, if Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, sworn to under penalty of perjury, setting forth such Seller's (or, if applicable, regarded owner's) name, address and U.S. federal tax identification number and stating that such Seller (or, if applicable, regarded owner) is not a "foreign person" within the meaning of Section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to Section 1445 of the Code.

"Fraud" shall mean an actual and intentional misrepresentation of material facts with respect to (i) the making of any representation or warranty of any Seller or Buyer set forth in Article 4, or Article 5 or in any other Transaction Document or (ii) the certifications of Sellers or Buyer, respectively, set forth in the certificates delivered by Sellers and Buyer pursuant to Section 7.1(f) and Section 7.2(d), respectively, in each case which satisfies all of the elements of common law fraud under applicable Law.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government, (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange.

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, novation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Entity or pursuant to any Law.

"HIPAA" shall have the meaning specified in Section 4.18(i).

"Incentive Plan" means that certain *EYP Group Holdings, Inc. Key Employee Retention and Incentive Plan dated May 7, 2021,* as supplemented and amended from time to time.

"Intellectual Property" means all intellectual property and proprietary rights of any kind in any and all jurisdictions throughout the world (whether arising under statutory or common law), including: (a) inventions, discoveries, patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing, (b) trademarks (whether registered, unregistered or applied-for), service marks, trade names, slogans, designs, symbols, rights in design, any fictitious names, d/b/a's or similar filings related thereto, trade dress, domain names, social media accounts, social media identifiers (such as a Twitter® handle), corporate legal entity names, brand names, logos, together with the goodwill associated exclusively therewith, and any registrations or applications related to the foregoing, (c) copyrights, including copyrights in computer software and in databases, moral rights and renewals in connection therewith, (d) rights of publicity (i.e., the right to commercially use the name, likeness, image, voice, or identity of individuals), (e) trade secrets, and rights in know-how or confidential and proprietary information, including rights in formulae, methods, techniques, processes, assembly procedures, computer software code, specifications, drawings, prototypes, molds and models, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans; and (f) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associate therewith.

"Interim Financial Statements" shall have the meaning specified in Section 4.16.

"Interim Period" shall have the meaning specified in Section 6.1.

"Joint Venture Interests" shall mean, collectively, any interest of any Seller in EYP-Loring, LLC and EYP Squared Joint Venture, LLC, including all rights of any Seller pursuant to any joint venture agreements, operating agreements, or other governance documents for such entities.

"Knowledge" shall mean, with respect to any Seller, the actual knowledge of Kefalari L. Mason, after reasonable inquiry, including the facts of which such individual would be aware in the reasonably prudent exercise of his or her duties, and with respect to the Buyer, the actual knowledge of Thomas McCarthy after reasonable inquiry, including the facts of which such individual would be aware in the reasonably prudent exercise of his or her duties.

"Law" shall mean any federal, state, provincial, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, Order, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Leases" shall mean all unexpired leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Leased Real Property.

"Leased Real Property" shall mean all Real Property leased, subleased, used, or occupied by a Seller Relating to the Business.

"Liabilities" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"License Agreements" shall mean all active license agreements to which any Seller is a party where such agreement is material to the Business, with the exception of any off-the-shelf or clickwrap software, which license agreements are set forth on Schedule 1.1(i).

"Licensed Software" shall have the meaning specified in Section 4.14(e).

"Lien" shall have the meaning specified in section 101(37) of the Bankruptcy Code and shall include any pledge, option, charge, lien, license, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

"Material Contracts and Leases" shall have the meaning specified in Section 4.12.

"Neutral Accountant" shall mean a national independent accounting firm selected by Buyer and reasonably acceptable to Sellers.

"Notices" shall have the meaning specified in Section 9.4.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" shall mean an action taken consistent with past practices of such Person immediately prior to the Petition Date, but subject, however, to changes arising or resulting from (x) the filing or pendency of the Chapter 11 Cases and (y) the COVID-19 pandemic.

"Outside Date" shall mean June 30, 2022, at 11:59 p.m. prevailing Eastern Time.

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates, certificates of occupancy, accounts, approvals, consents, clearances and other similar documents and authorizations issued by any Governmental Entity.

"Permitted Liens" shall mean:  (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; (d) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use of the subject Real Property; (e) Liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement; (f) easements, covenants, conditions, restrictions and other similar encumbrances on Real Property that arise in the Ordinary Course of Business; (g) non-exclusive licenses granted in the Ordinary Course of Business; (h) Liens that constitute Assumed Liabilities (including Liens existing under the Assigned Contracts); and (i) any Lien that will not be removed or released by operation of the Sale Order or any other Order of the Bankruptcy Court.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Personally Identifiable Information" shall mean all personally identifiable information held by, or under the control of, Sellers, or used by Sellers Relating to the Business.

"Petition Date" shall have the meaning specified in the recitals.

"Post-Closing Covenant" shall have the meaning specified in Section 9.12.

"PPACA" shall have the meaning specified in Section 4.18(i).

"Previously Omitted Contract" shall have the meaning specified in Section 2.5(b).

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity, including any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Property Taxes" shall mean all Real Property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" shall have the meaning specified in Section 3.2(a).

"Real Property" shall mean any real estate, land, building, structure, improvement, fixtures or other real property of any kind or nature whatsoever owned, leased or occupied by any Person, and all appurtenant and ancillary rights thereto, including easements, covenants, water rights, sewer rights and utility rights.

"Registered IP" shall have the meaning specified in Section 4.14(a).

"Relating to the Business" shall mean used primarily or exclusively in the operation or conduct of the Business as conducted as of immediately prior to the Petition Date.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Sale Hearing" shall have the meaning set forth in the Bidding Procedures.

"Sale Motion" shall mean the motion of Sellers, in form and substance satisfactory to Buyer in its sole discretion, seeking entry of the Sale Order.

"Sale Order" shall mean an Order of the Bankruptcy Court satisfactory to Buyer in its sole discretion pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Acquired Assets to Buyer on the terms and conditions set forth herein, which shall, among other things: (a) approve the assumption and assignment to Buyer of the Assumed Contracts and Assumed Leases; (b) approve the consummation of the Transactions contemplated by the Agreement; (c) find that the sale by Sellers to Buyer of the Acquired Assets is free and clear of all Claims (including any and all intercompany claims between and/or among Sellers) and Liens (except Permitted Liens) to the fullest extent permitted by section 363(f) of the Bankruptcy Code; and (d) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code.

"Secured Debt" shall have the meaning specified in Section 3.2.

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Seller Material Adverse Effect" shall mean any change, effect, event, occurrence, circumstance, state of facts or development that, individually or in the aggregate (taking into account all other such changes, effects, events, occurrences, circumstances, states of facts or developments), (a) has had, or would reasonably be expected to have, a material adverse effect on the ability of Sellers to consummate the Transactions, (b) has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, taken as a whole or (c) is materially adverse to Buyer's ability to operate or conduct the Business in the manner which it is currently

operated or conducted by Sellers; provided, however, the terms "material adverse effect" and "materially adverse" shall not include any change, effect, event, occurrence, circumstance, state of facts or development that, directly or indirectly, alone or taken together, arising out of or attributable to: (i) any change generally affecting the international, national or regional markets applicable to the Acquired Assets; (ii) any changes in, or effects arising from or relating to, national or international political or social conditions, including the engagement by the United States or any other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States; (iii) acts of nature, including outbreaks of illness or health emergencies (including the COVID-19 pandemic, and business, travel, shelter-in-place laws, and other restrictions related thereto), hurricanes, storms, floods, earthquakes and other natural disasters or force majeure events; (iv) any action required to be taken by this Agreement; (v) the filing or pendency of the Chapter 11 Cases, any order of the Bankruptcy Court or any actions or omissions of Sellers taken or not taken in order avoid a violation of such order (except as set forth in this Agreement); (vi) any objections in the Bankruptcy Court to this Agreement and the Transactions; (vii) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (viii) the disposition of any Excluded Assets; (vi) the breach of this Agreement by Buyer; (ix) the failure of Sellers to obtain any consent (including to assign any Contract or Permit), Permit, authorization, waiver or approval required in connection with the Transactions (except as set forth in this Agreement); (x) any items set forth in the Disclosure Schedule; (xi) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions or the identity, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise, of the Acquired Assets with employees, customers, lessors, suppliers, vendors or other commercial partners (except as set forth in this Agreement); and (xii) any action taken by any Seller at the express written request of Buyer.

"Sellers' Representative" shall have the meaning specified in Section 9.17.

"Senior Secured Loan" shall mean the obligations of Sellers and their Affiliates pursuant to that certain Credit Agreement, dated as of June 28, 2016 by and among EYP, Inc., certain guarantors, KeyBank National Association, as administrative agent, and certain lenders.

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Successful Bidder" shall mean, if an Auction is conducted, the prevailing party with respect to the Acquired Assets at the conclusion of such Auction.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, unclaimed property or escheatment, environmental, profits, windfall profits, gross receipts, sales, use, highway use, fuel, vehicle registration, value added, transfer, registration, stamp, premium, excise, customs duties, severance, Real Property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"<u>Tax Authority</u>" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"<u>Tax Return</u>" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"<u>Transaction Documents</u>" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to or in furtherance of the terms hereof.

"<u>Transactions</u>" shall mean the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets as provided for in this Agreement.

"<u>Transfer Tax</u>" or "<u>Transfer Taxes</u>" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"<u>Transferred Intellectual Property</u>" shall have the meaning specified within the definition of "Acquired Assets."

"<u>Transferred Employee</u>" shall have the meaning specified in <u>Section 6.12(a)</u>.

"<u>Transition Services Agreement</u>" shall have the meaning specified in <u>Section 3.1(b)(iii)</u>.

"<u>Updating Information</u>" shall have the meaning specified in <u>Section 9.16</u>.

"<u>U.S. Person</u>" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

1.2    <u>Interpretation</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this Agreement unless otherwise specified.  All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections and paragraphs of, and schedules and exhibits to, this Agreement unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    Subject to Section 9.13, when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.  All references herein to time are references to New York City time, unless otherwise specified herein.

(j)    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)    A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)    Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any

Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES

2.1     Assets to be Acquired.  Subject to entry of the Sale Order, and the terms and conditions of this Agreement, any other Transaction Documents, and the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey, grant and deliver to Buyer, and Buyer, as a good faith purchaser for value within the meaning of section 363(m) of the Bankruptcy Code, shall purchase and acquire from Sellers all of Sellers' right, title and interest, free and clear of all Liens (except for the Permitted Liens), in and to each and all of the Acquired Assets.  Notwithstanding anything to the contrary, Buyer shall only acquire the Acquired Assets and neither Buyer nor any Affiliate of Buyer shall acquire, and there shall be excluded from the definition of Acquired Assets, any and all Excluded Assets.

2.2     Liabilities to be Assumed by Buyer.  Subject to the terms and conditions of this Agreement, any other Transaction Documents, and the Sale Order, at the Closing, Sellers shall assign to Buyer, and Buyer shall assume from Sellers and pay when due, perform and discharge, in due course, each of the Assumed Liabilities.

2.3     Excluded Liabilities.  Buyer shall not, and does not, assume, and shall not be obligated to pay, perform, discharge, or in any other manner be liable or responsible for any Liabilities (except the Assumed Liabilities), including the Excluded Liabilities.

2.4     Wrong Pockets.  Subject to the terms and conditions of this Agreement and any other Transaction Documents, if after the Closing (i) Buyer or any of its Affiliates holds any Excluded Assets or Excluded Liabilities, or (ii) any Seller holds any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

2.5     Assumption and Assignment of Contracts and Leases.

(a)     Each Seller shall assume and, to the extent assignable, assign to Buyer all of the executory Contracts and Leases of such Seller (such Contracts, the "Assumed Contracts", and such Leases, the "Assumed Leases") effective on and as of the Closing, subject to Section 2.5(e); provided, however, Buyer may provide a written notice to Sellers, which notice shall be provided no later than three (3) Business Days prior to the Auction, of its decision (i) to designate one or more executory Contracts as Excluded Contracts and (ii) to add and/or remove Material Contracts and Leases from Schedule 4.12.

(b)     If prior to Closing, it is discovered that a Contract or Lease should have been listed on Schedule 4.12 but was not listed on Schedule 4.12 (such Contract or Lease, a "Previously Omitted Contract"), Seller shall, promptly following the discovery thereof or receipt of notice from Buyer of its desire to designate any such Previously Omitted Contract as a Material Contract (but in no event later than three (3) Business Days following the discovery thereof or

receipt of such notice), notify Buyer in writing of such Previously Omitted Contract. With respect to counterparties to any Previously Omitted Contract which were not notified of their respective Cure Amount in accordance with the Bid Procedures Order, neither such counterparty nor the Committee shall be precluded from seeking expedited relief from the Bankruptcy Court in regard to the Cure Amount and (as to the counterparty) the provision of adequate assurance.

(c)     Sellers shall take all actions required to assume and assign the Assumed Contracts and Assumed Leases to Buyer (other than payment of Cure Costs, if so required), including providing timely and proper written notice of the Sale Motion to all counterparties to Assumed Contracts and Assumed Leases, taking all actions required to facilitate any negotiations with the counterparties to such Assumed Contracts and Assumed Leases and taking all actions required to obtain an Order from the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assumed Contracts and Assumed Leases to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(d)     Subject to Section 2.5(e), at the Closing, Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, sell, and assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Assumed Contracts and Assumed Leases that may be assigned by any such Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable, subject to provision by Buyer of adequate assurance as may be required under section 365 of the Bankruptcy Code and payment by Buyer of the Cure Costs in accordance with Section 6.8 in respect of Assumed Contracts and Assumed Leases pursuant to and in accordance with section 365 of the Bankruptcy Code, as applicable, and the Sale Order. At the Closing, subject to Section 2.5(e), Buyer shall assume, and thereafter in due course and in accordance with its respective terms (as may be amended) pay, fully satisfy, discharge and perform all of the obligations under each Assumed Contract and Assumed Lease that are Assumed Liabilities, pursuant to section 365 of the Bankruptcy Code, as applicable.

(e)     Notwithstanding the foregoing, an Assumed Contract or Assumed Lease shall not be transferred to, assigned to, or assumed by, Buyer at Closing to the extent that such Contract or Lease (i) is terminated by a Seller (subject to Section 6.1(a)) or the counterparty thereto, or terminates or expires by and in accordance with its terms, on or prior to the Closing Date and is not continued or otherwise extended upon assumption, (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to the Closing Date (such Assumed Contracts, the "Delayed Contracts"), or (iii) relates to, arises under, or was entered into in connection with the performance of any Delayed Contract, which shall not be transferred to, assigned to, or assumed by Buyer unless and until Consent or Governmental Authorization for the applicable Delayed Contract is obtained.  In the event that any Delayed Contract is not assigned at Closing pursuant to Section 2.5(c) because the requisite Consent or Governmental Authorization for such Delayed Contract has not yet been obtained, the conditions contained in Article 7 shall be deemed waived with respect to such Delayed Contract, and the Closing shall nonetheless take place without any adjustment to the Purchase Price on account thereof, and thereafter through the earlier of such time as such Consent or Governmental Authorization is obtained and such period as specified in the Transition Services Agreement following the Closing (or the remaining term of such Delayed Contract, if shorter), Sellers and Buyer shall (A) use commercially reasonable efforts

19

to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement, in each case pursuant to the terms of the Transition Services Agreement with respect to any such Delayed Contract. Subject to the terms of the Transition Services Agreement, with respect to any Delayed Contract, (1) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Delayed Contract and (2) Buyer shall assume any related burden and obligation (including performance) with respect to such Delayed Contract. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Delayed Contract after the Closing, such Delayed Contract shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement, the Transition Services Agreement and the Sale Order. In connection with and without limiting the foregoing, and subject to the terms of the Transition Services Agreement, for so long as a Delayed Contract is not transferred to Buyer, each party will use commercially reasonable efforts and cooperate in good faith with the other party to enable Sellers to perform the services thereunder, in all cases, without infringing upon the legal rights of any third party or violating any Law and subject to the other terms of this <u>Section 2.5(e)</u>, such that Sellers may provide delivery with respect to customer commitments thereunder and Buyer shall obtain the economic rights and benefits under such Delayed Contract.

### ARTICLE 3
### CLOSING; PURCHASE PRICE

3.1     <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)     Subject to the terms and conditions of this Agreement, the consummation of the Transactions (the "<u>Closing</u>") shall take place on or before the second Business Day after the satisfaction or waiver of all of the conditions set forth in <u>Article 7</u> (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or the waiver thereof at the Closing by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree. The Closing shall be held by electronic exchange of executed documents (or, if the parties elect to hold a physical Closing, at the offices of DLA Piper LLP (US), at 10:00 a.m. prevailing Eastern Time, unless the Parties hereto otherwise agree). The actual date of the Closing, effective 12:00 a.m. prevailing Eastern Time on such date, is herein called the "<u>Closing Date</u>".

(b)     At the Closing, Sellers shall deliver to Buyer:

(i)     for each Seller, an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of such Seller certifying that the conditions set forth in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> have been satisfied;

(ii)     the duly executed Bill of Sale and Assignment and Assumption Agreement and Assignment of Intellectual Property in substantially the forms attached hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectively;

(iii)    the duly executed Transition Services Agreement, which, subject to any requirements of any Governmental Entity, shall be in substantially the form attached hereto as Exhibit D (the "Transition Services Agreement");

(iv)    a W-9 form for each Seller;

(v)    all consents, orders, and approvals of the Bankruptcy Court related to the Transactions, including a certified copy of the Sale Order;

(vi)    copies of the resolutions of the governing bodies of the Sellers authorizing the sale of the Acquired Assets, the execution and delivery of this Agreement and the other Transaction Documents, and the consummation of the Transactions;

(vii)    originals (or to the extent originals are not available, copies) of all Assumed Contracts and Assumed Leases (together with all amendments, supplements, or modifications thereto) to the extent not already made available to Buyer in the virtual data room;

(viii)    possession of the Acquired Assets, including all keys, locks, passcodes, safe combinations, login credentials, passwords and other similar items, data, and information as Buyer may reasonably require to obtain occupation and control of the Acquired Assets, in each case subject to any applicable restrictions on access to classified information;

(ix)    for each Seller (or if any Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, a duly executed FIRPTA Affidavit from each such Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner);

(x)    all waivers, consents, and approvals required for the assignment and assumption of the Assumed Contracts and Assumed Leases from Sellers to Buyer, except as otherwise provided in Section 2.5(e); and

(xi)    such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer free and clear of all Liens and assumption of Assumed Liabilities by Buyer in accordance with the terms hereof.

(c)    At the Closing, Buyer shall:

(i)    deliver to Sellers payment by wire transfer of immediately available funds to an account set forth by Sellers of an aggregate amount equal to the cash portion of the Purchase Price;

(ii)    deliver to Sellers an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied;

(iii)    deliver to Sellers the duly executed Bill of Sale and Assignment and Assumption Agreement and Assignment of Intellectual Property in substantially the forms attached hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectively;

(iv)    deliver to Sellers the duly executed Transition Services Agreement, which, subject to any requirements of any Governmental Entity, shall be in substantially the form attached hereto as <u>Exhibit D</u>; and

(v)    deliver to Sellers such other assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer.

3.2    <u>Consideration</u>.

(a)    <u>Purchase Price</u>.  The aggregate consideration for the Acquired Assets shall be (A) an aggregate dollar amount equal to $70,400,000, as adjusted by an amount, if any, equal to the Closing Working Capital *minus* the Closing Working Capital Target (the "<u>Purchase Price</u>"), plus (B) Buyer's assumption of the Assumed Liabilities not accounted for in the Closing Working Capital or Closing Purchase Price Adjustment calculations.  Buyer shall pay the Purchase Price by paying cash in an amount equal to the difference between the Purchase Price *minus* the Closing Purchase Price Adjustment.  Solely for purposes of the calculations contemplated by this Section 3.2(a), the amounts of Assumed Liabilities identified on <u>Schedule 1.1(o)</u> shall be as set forth on <u>Schedule 1.1(o)</u>.

3.3    <u>Allocation of Purchase Price</u>.  (i) The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among Sellers and (ii) the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "<u>Allocation</u>"). The Allocation shall be delivered by Buyer to Sellers within sixty (60) days after the Closing.  Sellers' Representative, on behalf of Sellers, will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and Sellers' Representative will negotiate in good faith to resolve such dispute. If Buyer and Sellers' Representative cannot resolve such dispute within fifteen (15) days after Sellers' Representative notifies Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by the Neutral Accountant.  The fees, costs and expenses of the Neutral Accountant (i) shall be borne by Buyer in the proportion that the aggregate dollar amount of all such disputed items so submitted that are unsuccessfully disputed by Buyer (as finally determined by the Neutral Accountant) bears to the aggregate dollar amount of such items so submitted and (ii) shall be borne by Sellers in the proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Buyer (as finally determined by the Neutral Accountant) bears to the aggregate dollar amount of all such items so submitted. The decision of the Neutral Accountant in respect of the Allocation shall be final and binding upon Buyer and Sellers. Buyer and Sellers shall file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation absent a change in Law; provided, however, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Tax Authority

based upon or arising out of the Allocation, and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Buyer and any applicable Seller shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price and the amount of the Assumed Liabilities pursuant to this Section 3.3. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date and as of the Closing as follows:

4.1    Organization.  Except as set forth in Schedule 4.1 to the Disclosure Schedules, each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and hold its assets, rights and properties and to conduct its Business as now owned, leased, held and conducted in its jurisdiction of organization and in the other jurisdictions in which it is required to register or qualify to do business.

4.2    Authorization of Transaction.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

4.3    Governmental Consents.  Except as set forth in Schedule 4.3 to the Disclosure Schedules, other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order or the Sale Order, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any Transaction Document, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Seller Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the Transactions or perform its obligations hereunder on a timely basis.

4.4    No Conflicts.  Subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by each Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of

23

incorporation or bylaws or comparable governing documents, (b) except as set forth in Schedule 4.4(b) to the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation of any right or obligation or to a loss of any benefit, under any provision of any Material Contracts and Leases, (c) result in a violation of any Law or Order applicable to it or (d) result in the creation or imposition of any Lien on any Acquired Assets other than Permitted Liens, except, in the case of clauses (b) and/or (c), as would not, individually or in the aggregate, be, or reasonably be expected to have a Seller Material Adverse Effect.

4.5     Acquired Assets.  Upon the terms and subject to the conditions contained in this Agreement and subject to requisite Bankruptcy Court approvals and the terms of the Sale Order, at the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets, except to the extent the failure to have such title or right to use would not reasonably be expected to have a Seller Material Adverse Effect.  Pursuant, and subject, to the Sale Order, Sellers shall convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens). The Acquired Assets include substantially all of the furniture, fixtures, properties, assets, rights and equipment used by Sellers in, and which are reasonably necessary and sufficient in all respects, for the conduct and operation of the Business as conducted and operated by the Sellers as of the Agreement Date. To Sellers' Knowledge, as of the Agreement Date and as of the Closing Date, no Subsidiary identified on Schedule 1.1(p) has any Liabilities required to be reflected on a balance sheet prepared in accordance with GAAP, except (a) those that are reflected or reserved against in the balance sheet of EYP as of April 1, 2022, and (b) those that have been incurred in the Ordinary Course of Business but not reflected on the balance sheet of EYP as of April 1, 2022, and that are not, individually or in the aggregate, in excess of $100,000, which amount excludes any guarantee obligations in connection with the Secured Debt.

4.6     Litigation; Orders.  Except for the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on Schedule 4.6 to the Disclosure Schedules, there is no Claim, Proceeding or Order pending, outstanding or, to any Sellers' Knowledge, threatened against any Seller that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby.

4.7     Tangible Personal Property.  Schedule 4.7 to the Disclosure Schedules sets forth all personal property leases with annual payments in excess of $20,000 Related to the Business. Except for potential or alleged defaults arising from Sellers' failure or alleged failure to pay amounts owed under such personal property leases prior to the Petition Date, each such personal property lease is valid and enforceable, subject to the entry of the Sale Order.

4.8     Employment Matters.

(a)     No Employee is covered by, and the Company is not bound by, a collective bargaining or other labor-related agreement with any union or employee organization.  Within the past three (3) years, no Seller has been asked to recognize any union or collective bargaining unit or union contribution agreement.  To Sellers' Knowledge, within the past three (3) years, no

organizational attempt has been made by or threatened by or on behalf of any labor union or collective bargaining unit with respect to any Employee, and there are and, in the past three (3) years, have been no strikes, slowdowns, work stoppages, lockouts, or other labor disputes pending or threatened against or involving any Seller.  There is no unfair labor practices complaint, charge, administrative proceeding, or claim against any Seller pending or threatened before the National Labor Relations Board or any comparable Governmental Entity.

(b)      Intentionally omitted.

(c)      To the Knowledge of Sellers, and except as would not reasonably be expected to have a Seller Material Adverse Effect, Sellers are in compliance in all material respects with all applicable laws, agreements, contracts and policies relating to employment, employment practices, human rights, wages, hours, meals and rest period breaks, job classifications and terms and conditions of employment. Except as provided in Schedule 4.8(c) to the Disclosure Schedules, there is no material litigation or Claims pending or, to Sellers' Knowledge, threatened against any Seller by any past or current Employee.  As of the Agreement Date and the Closing Date, all compensation (including wages, commissions, bonuses, fees and other compensation) payable to all Employees and independent contractors of the Sellers for service performed prior to such dates have been paid in full, except as set forth on Schedule 4.8(c). To the Knowledge of Sellers, Sellers have complied with all applicable immigration Laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations.

(d)      Subject to applicable Governmental Authorizations, Sellers have provided Buyer a true and correct list, as of the Agreement Date, of the names and titles of and current annual base salaries or hourly rates for all full time or part time Employees and consultants of the Business, together with each employee's title or position, job location, leave status (if any) (including type of leave and, if known, anticipated return-to-work date), visa status, status as exempt or non-exempt under applicable overtime and minimum wage Laws, the date of each employee's original hiring and, as applicable, the full amount and nature of any other remuneration or fringe benefits, whether in cash or kind, paid to each such person during the last or current fiscal year or payable or committed to be paid to each such person in the future, and the bonuses accrued for, and the vacation, sick time, or other paid time off to which each such person is entitled. Schedule 4.8(d) of the Disclosure Schedule accurately identifies all contracts or other agreements to which each such Employee and any Seller are parties (including employment, confidentiality, non-compete, consulting, and proprietary rights agreements).  Except as set forth in Schedule 4.8(d) of the Disclosure Schedule, the employment of each current Employee of each Seller is at-will.

(e)      Schedule 4.8(e) to the Disclosure Schedules sets forth, as of the Agreement Date, the (i) name, (ii) date of retention, (iii) identification of written agreement, if any, and, if none, a description of services provided, and (iv) rate of compensation of each independent contractor or non-employee service provider, in each case who is a natural Person.

(f)      No Seller has incurred any liability under, and each Seller has complied in all respects with, the WARN Act, and does not reasonably expect to incur any such liability as a result of actions taken or not taken prior to or as of the Closing.  No Seller has given, nor been required to give, any notice under the WARN Act within ninety (90) days prior to the Closing.

4.9     Compliance with Laws; Permits.  Sellers are in compliance with all Laws applicable to the Business, except as resulting from the filing and pendency of the Chapter 11 Cases or where the failure to be in compliance would not be reasonably expected to have a Seller Material Adverse Effect.  Except as provided on Schedule 4.9(a) to the Disclosure Schedules, Sellers have not received any notice or other communication (whether written or oral) from any Governmental Entity or any other Person regarding any actual, alleged, possible or potential breach, violation of or non-compliance with any Law to which any Seller, the Business, or any of the Acquired Assets is or has been subject.  Sellers have obtained all Permits which are required for the operation of the Business as presently conducted, except where such failure to obtain such Permits would not reasonably be expected to have a Seller Material Adverse Effect.  Schedule 4.9(b) to the Disclosure Schedules contains a true and correct list of all such Permits.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to have a Seller Material Adverse Effect.

4.10    Trade Controls.  Sellers, their respective directors, officers, and employees, and to Sellers' Knowledge, Sellers' agents and representatives are and have, since October 1, 2018, been in compliance with (a) U.S. and any applicable foreign economic sanctions Laws and regulations, including economic sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, and (b) all U.S. and applicable foreign Laws and regulations relating to import and export controls (collectively, the "Trade Controls").  Neither Sellers, nor their respective officers, directors, agents, employees, or any third-party acting on their behalf (x) is or has been designated on any sanctions-related list of restricted or blocked persons, including the U.S. Department of the Treasury's Office of Foreign Assets Control's list of "Specially Designated Nationals and Blocked Persons", (y) is located in, organized under the Laws of, or resident in any country or territory that is itself the subject of any economic or financial sanctions by any Governmental Entity, or (z) owned or controlled by any Person described in clause (x) or (y).  There have been no complaints, charges, investigations, voluntary disclosures, or Litigation under Trade Controls involving Sellers, and to Sellers' Knowledge, there are no pending or threatened claims or investigations involving suspect or confirmed violations thereof.

4.11    Anti-Bribery Laws.  To the Seller's Knowledge, neither Sellers nor any of their respective directors, officers, employees or agents, nor any third parties acting on their behalf, is and, since October 1, 2018, has been engaged, directly or indirectly, in any activity in violation of (a) the Foreign Corrupt Practices Act of 1977, as amended, (b) any other applicable Law of a Governmental Entity of similar effect or that relates to bribery or corruption (collectively, "Anti-Bribery Laws"), or (c) any applicable money laundering Laws.  Since October 1, 2018, Sellers have conducted the Business in compliance with all applicable Anti-Bribery Laws and money laundering Laws and has instituted and maintains policies, controls, and procedures, and an internal accounting system reasonably designed to ensure, and which are reasonably expected by Sellers to continue to ensure compliance therewith and that violations of applicable Anti-Bribery Laws and money laundering Laws will be prevented, detected, and deterred.  Since October 1, 2018, Sellers have not been the subject of or involved in any Litigation or, to Seller's Knowledge, threatened Litigation, relating to compliance with Anti-Bribery Laws or money laundering Laws, and there have been no allegations (internal or external) against Sellers, including their respective

directors, officers, employees, agents, or third parties acting on behalf of any Seller regarding non-compliance with the foregoing.

4.12   <u>Contracts and Leases</u>.  <u>Schedule 4.12</u> to the Disclosure Schedules sets forth a true and complete list of each Seller's (a) Leases and (b) current projects that are subject to executory Contracts that, to the Knowledge of Sellers, involve, on the per-contract basis, aggregate future consideration in excess of $250,000 as of the Agreement Date, and Sellers have delivered to Buyer true and complete copies of all such Leases and Contracts in the possession of Sellers (in each case, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof) (collectively, the "<u>Material Contracts and Leases</u>").  Sellers have not assigned, delegated, or otherwise transferred to any third party any of their respective rights or obligations with respect to any Assumed Contracts or Leases.  The Material Contracts and Leases are, to Sellers' Knowledge, all Contracts and Leases material to the ownership and/or operation of the Business.  To Sellers' Knowledge, Sellers are not in breach of, or default under, any Material Contracts and Leases, or any Assumed Contracts (except, as to any Assumed Contract(s), as would not reasonably be expected to have a Seller Material Adverse Effect).  Except as set forth in <u>Schedule 4.12</u> of the Disclosure Schedules, (a) no Seller has, and to Sellers' Knowledge, no other party has, commenced any action with respect to any Material Contracts and Leases or any Assumed Contracts (except, as to any Assumed Contract(s), as would not reasonably be expected to have a Seller Material Adverse Effect) or given or received any notice of any default or violation under any Material Contract and Lease or any Assumed Contracts (except, as to any Assumed Contract(s), as would not reasonably be expected to have a Seller Material Adverse Effect); and (b) Sellers have not received notice of the pending or threatened cancellation, revocation or termination of any of the Material Contracts and Leases or any Assumed Contracts (except, as to any Assumed Contract(s), as would not reasonably be expected to have a Seller Material Adverse Effect), nor do they have Knowledge of any facts or circumstances that could reasonably be expected to lead to any such cancellation, revocation or termination.  Subject to any applicable Governmental Authorizations and entry of the Sale Order, to Sellers' Knowledge, each Assumed Contract and Lease is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms (subject to payment of any Cure Costs).

4.13   <u>Real Property</u>.  Sellers do not have any fee simple interest in real property. <u>Schedule 4.13</u> to the Disclosure Schedules sets forth the address of each Leased Real Property Related to the Business.  Sellers have made available to Buyer a true and complete copy of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property.  Except as set forth in <u>Schedule 4.13</u>, with respect to each of the Assumed Leases, (a) to Sellers' Knowledge, each Assumed Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (b) Sellers' possession and quiet enjoyment of the Leased Real Property has not been disturbed; (c) to Sellers' Knowledge, there are no disputes with respect to any Sellers' obligations under such Lease that will not be satisfied by entry of the Sale Order and the payment of the Cure Costs by Buyer; (d) to Sellers' Knowledge, no Seller is in material breach or default under any of the Assumed Leases; (e) Sellers have not subleased, licensed, or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (f) to Sellers' Knowledge, there are no Liens on the estate or interest created by such Lease.

4.14   <u>Intellectual Property</u>.

(a)    Schedule 4.14(a) to the Disclosure Schedules sets forth a true, correct and complete list of all Intellectual Property that is, as of the Agreement Date, registered or subject to an application for registration, including all Internet domain registrations owned by any Seller, which are Related to the Business (the "Registered IP").

(b)    Sellers own, or have the right to use, all Registered IP and all Transferred Intellectual Property free and clear of all Liens (other than Permitted Liens).  The Transferred Intellectual Property includes all Intellectual Property necessary for the material operation of the Business in the Ordinary Course of Business.

(c)    To the Sellers' Knowledge: (i) the Transferred Intellectual Property and use thereof does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person except as would not, individually or in the aggregate, be, or reasonably be expected to be, a Seller Material Adverse Effect; (ii) no Person is infringing, misappropriating or otherwise violating the Registered IP or other Transferred Intellectual Property; (iii) there are no royalties or other payments payable by any Seller to any Person by reason of the ownership, use, license, sublicense, transmission, broadcast, deliver, sale, or disposition of the Transferred Intellectual Property; (iv) there is no pending or threatened claim or Litigation contesting the validity, ownership or right to use, sell, license, sublicense, transmit, broadcast, deliver or dispose of any Transferred Intellectual Property, nor, to Sellers' Knowledge, is there a basis for any such claim; (v) no Seller has received a notice in the last two (2) years asserting that any Transferred Intellectual Property or the proposed ownership, use, license, sublicense, transmission, broadcast, deliver, sale, or disposition thereof conflicts with the Intellectual Property rights of any other Person, nor, to Sellers' Knowledge, is there a basis for any such assertion.

(d)    All trademarks that are Registered IP, if any, of Sellers are valid and subsisting.  To the Sellers' Knowledge, there has been no prior use of such trademarks by any third party which would confer upon such third-party superior rights in such trademarks.

(e)    Schedule 4.14(e) to the Disclosure Schedules sets forth a true and complete list of software programs and applications that are licensed by any Seller from any third party and used by any Seller and that are material to the operation of the Business (the "Licensed Software"). To the Sellers' Knowledge, each of the license agreements relating to the Licensed Software are valid and binding obligations, enforceable in accordance with their terms, and there exists no event or condition which will result in a violation or breach of, or constitute (with or without notice or lapse of time or both) a default by the applicable Seller or licensor under any such license agreement.

4.15    Brokers' Fees and Commissions.  Except as set forth on Schedule 4.15 to the Disclosure Schedules, no Seller nor any of its members, managers, directors, officers, employees or agents has employed or has any liability to any investment banker, broker, finder, agent or similar intermediary in connection with this Agreement, the other Transaction Documents, or the Transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's fee, finder's fee, or similar fee or commission in connection therewith based on any agreement, arrangement or understanding.  All amounts owed to each Person identified on Schedule 4.15 shall be paid as of the Closing Date (or such later date as may be required by Law) from Sellers' cash on hand.

4.16    <u>Financial Statements</u>.  Sellers have delivered to Buyer complete copies of (a) the audited balance sheets of the Company as of December 27, 2019, and related audited statements of income for the fiscal year then ended (the "<u>Audited Financial Statements</u>"); and (b) the draft audited balance sheets of the Company at December 25, 2020 and related draft audited statements of income for the fiscal year then ended, and the unaudited balance sheet of the Company at December 31, 2021, and the related unaudited statements of income for the twelve-month period then ended (the "<u>Interim Financial Statements</u>" and together with the Audited Financial Statements, the "<u>Financial Statements</u>").  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes. The Financial Statements fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.  Since December 31, 2018, Sellers have not received any written complaint, allegation, assertion or claim regarding their accounting or auditing practices, procedures, methodologies or methods or their internal accounting controls Related to the Business.  The financial books and records of Sellers have been maintained in accordance with customary business practices and, taken together, fairly and accurately reflect on a basis consistent with past periods and throughout the periods involved the financial position of Sellers.  Sellers maintain a system of internal accounting controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, including that (y) transactions are executed in accordance with management's general or specific authorizations; and (z) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  Seller has not received any advice or notification from any independent accountants that it has used any improper accounting practice that would have the effect of not reflecting or incorrectly reflecting in the books and records of Sellers any assets, Liabilities, revenues, expenses, equity accounts, or other accounts.  There have been no instances of Fraud, whether or not material, that occurred during any period covered by the Financial Statements.  Sellers have in place a revenue recognition policy consistent with GAAP.

4.17    <u>Tax Matters</u>. To Sellers' Knowledge, all material Tax returns required to be filed by Sellers with respect to the Acquired Assets have been duly and timely filed, and all such filed Tax returns were true, correct and complete in all material respects.  All material Taxes owed by Sellers with respect to the Acquired Assets and the Business (whether or not shown on any Tax return) have been paid.  There is no audit, dispute, claim, or controversy concerning any Tax Liability or Tax return of Sellers with respect to the Acquired Assets or the Business.  Sellers have not knowingly waived any statute of limitations in respect of an assessment or payment of Taxes with respect to the Business or the Acquired Assets or agreed to any extension of time with respect to any Tax assessment or deficiency on the Acquired Assets or the Business that to the Sellers' Knowledge remain unresolved and that could result in a Lien on the Acquired Assets or the imposition of any Liability for Taxes on Buyer.  There are no Liens for Taxes on any of the Acquired Assets.  Sellers have collected or withheld all material Taxes required to have been collected or withheld, and such Taxes have been or will be duly paid to the proper Governmental Entity, and, to Sellers' Knowledge, Sellers have complied in all material respects with all Laws relating to withholding, including any reporting and record-keeping requirements, to the extent failure to properly so comply could result in a Lien on the Acquired Assets or the imposition of any Liability for Taxes on Buyer.

4.18    <u>Employee Benefits Matters</u>.

(a)    <u>Schedule 4.18(a)</u> of the Disclosure Schedules sets forth a correct and complete list of all material Benefit Plans maintained, sponsored or contributed to by Sellers or their Subsidiaries as of the Agreement Date.

(b)    Sellers have provided or made available to Buyer, with respect to each Assumed Benefit Plan, the following, to the extent applicable to such Benefit Plan: (i) a copy of the three (3) most recent Form 5500 annual reports including all schedules and attachments to such report (if required under ERISA), (ii) a copy of the summary plan description (if required under ERISA), together with a summary of material modifications required under ERISA, (iii) a true and complete copy of the written plan document and all amendments thereto, (iv) a copy of all applicable nondiscrimination testing results under the Code for the previous three (3) years and (v) with respect to each such plan that is intended to be qualified under Section 401(a) of the Code or 413(c) of the Code, the most recent determination or opinion letter issued by the Internal Revenue Service with respect to the qualified status of such plan.

(c)    Except where such noncompliance would not have a Material Adverse Effect, each Assumed Benefit Plan has been operated and administered in all material respects in accordance with its terms and in compliance with all applicable Law, including ERISA and the Code. To Sellers' Knowledge, no event or change has occurred with respect to any Assumed Benefit Plan that is intended to be qualified under Section 401(a) or 413(c) of the Code that would reasonably be expected to cause the loss of such plan's tax qualified status, or has subjected or would reasonably be expected to subject the Company to a material penalty under Section 502 of ERISA or to an excise tax under the Code.

(d)    All required contributions (including all employer contributions and employee salary reduction contributions), premiums and other payments that have become due and owing as of the date hereof in respect of any current or former employee of the Company have been timely paid in accordance with each Assumed Benefit Plan.

(e)    Except as set forth in <u>Schedule 1.1(e)</u> of the Disclosure Schedule, no Assumed Benefit Plan is covered by Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code, and the Company and its ERISA Affiliates have not sponsored, maintained or contributed to such a plan within the six (6) years prior to the Closing Date. The Company and its ERISA Affiliates do not contribute to or have an obligation to contribute to, and have not at any time within six (6) years prior to the Closing Date contributed to or had an obligation to contribute to, (i) any "multiemployer plan" as defined in Section 3(37) of ERISA, (ii) a "defined benefit plan" as defined in ERISA Section 3(35), (iii) a pension plan subject to the funding standards of ERISA Section 302 or Code Section 412, (iv) a "multiple employer plan" within the meaning of ERISA Section 201(a) or Code Section 413(c), (v) a multiple employer welfare arrangement within the meaning of ERISA Section 3(40), or (vi) a VEBA under Code Section 501(c)(9).

(f)    No Seller nor any other "disqualified person" or "party in interest" as defined in Code Section 4975 and Section 3(14) of ERISA, respectively, has engaged in any "prohibited transaction," as defined in Code Section 4975 or Section 406 of ERISA, with respect to any Assumed Benefit Plan, nor, to Sellers' Knowledge, has there been any fiduciary violations

under ERISA that, in either case, could subject Sellers or their Subsidiaries to any material penalty or tax under Section 502 of ERISA or Code Section 4975. Neither Sellers nor, to Sellers' Knowledge, any of their respective ERISA Affiliates has any material liability of any kind whatsoever, whether direct, indirect, contingent or otherwise, on account of (a) any violation of the health care requirements of Part 6 of Title I of ERISA or Section 4980B of the Code, (b) under Section 302 of ERISA or Section 412 of the Code or (c) under Title IV of ERISA.

(g)      No actions, suits or claims or any audit or investigation by any governmental authority with respect to the assets of any ERISA Plan or Assumed Benefit Plan are pending or, to Sellers' Knowledge, threatened, that would reasonably be expected to have a Material Adverse Effect.  There is no voluntary compliance submission through the IRS Employee Plans Compliance Resolution System or the DOL's Voluntary Fiduciary Correction Program pending or in progress.

(h)      There are no Assumed Benefit Plans under which welfare benefits are provided to any current or former employees of Sellers or their Subsidiaries beyond their retirement or other termination of service, other than coverage mandated by Code Section 4980B, Subtitle B of Title I of ERISA or similar state group health plan continuation Laws, the cost of which is fully paid by the eligible participants or their dependents.  As of the Agreement Date, there are no legal proceedings pending (other than routine claims for benefits) by or on behalf of any current or former employee of Sellers or, to Sellers' Knowledge, threatened in writing against any of the Assumed Benefit Plans.

(i)      Each Assumed Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA is and has been in compliance, in all material respects, with each of the applicable requirements of ERISA and the Code, including Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA and with the Patient Protection and Affordable Care Act of 2010 ("PPACA"), and to Sellers' Knowledge, no event has occurred, and no condition or circumstance exists, that would reasonably be expected to result in a material liability for penalties or excise Taxes under Code Section 4980D or 4980H or any other provision of PPACA (including the requirement to timely file ACA information returns with the IRS or to provide applicable statements to employees under Section 6056 of the Code or 6055 as applicable). Each Assumed Benefit Plan that is a group health plan is in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the privacy and security laws governing protected health information under HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, and any applicable state health care privacy and security laws or comparable laws, to the extent applicable.

(j)      Each Assumed Benefit Plan that constitutes a nonqualified deferred compensation plan subject to Section 409A of the Code has been administered and operated in documentary and operational compliance in all material respects with the provisions of Section 409A of the Code and the Treasury Regulations thereunder. The Company does not have any "gross up" or indemnity obligation to any individual for taxes imposed under Code Section 4999 or 409A.

(k)      The consummation of the transactions contemplated by this Agreement will not materially increase the amount of, or result in the acceleration of, the time of payment, funding

31

or vesting of compensation or benefits under any Assumed Benefit Plan. There is no contract, agreement or Assumed Benefit Plan covering any current or former employee or director of the Company or any ERISA Affiliate, which individually or in the aggregate, could be expected to give rise to the payment of any amount which would constitute an "excess parachute payment" (as defined in Section 280G of the Code).

4.19    Absence of Changes.  To Sellers' Knowledge, from the Agreement Date through the Closing Date, Sellers have been operated in the Ordinary Course of Business, and there have not been any changes prohibited by Section 6.1 of this Agreement.

4.20    Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules), none of Sellers, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Seller.  Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules), Sellers are selling the Acquired Assets "as is-where is" and disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Seller).  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Seller Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers, as of the Agreement Date, and as of the Closing, except as set forth on the Disclosure Schedules, as follows:

5.1    Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer

enforceable against Buyer in accordance with their terms (subject to the entry of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Governmental Approvals.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by Buyer with respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except  (a) the Sale Order having been entered by the Bankruptcy Court and (b) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, be reasonably expected to result in a Buyer Material Adverse Effect.

5.4     No Conflicts.    The execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any Material Contract of Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

5.5     Sufficiency of Funds.  Buyer has, or at Closing will have, sufficient cash on hand to enable it to make payment of the cash portion of the Purchase Price and consummate the Transactions.

5.6     Adequate Assurances Regarding Executory Contracts.  As of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases.

5.7     Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), none of Buyer, its Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Buyer.  Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), Buyer disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any Representative of Buyer or any of their respective Affiliates).  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Buyer Material Adverse Effect.

5.8    <u>No Outside Reliance</u>.  Except as otherwise expressly provided in the Agreement, Buyer has not relied and will not rely on, and Sellers are not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Acquired Assets or relating thereto made or furnished by Sellers.  BUYER FURTHER ACKNOWLEDGES THAT SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH OR SAFETY MATTERS) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>.  During the period from the date of this Agreement and continuing until the earlier of (i) the termination of this Agreement in accordance with its terms and (ii) the Closing (the "<u>Interim Period</u>"),  except as may be required by Order of the Bankruptcy Court (<u>provided</u> that Sellers have not directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court) and applicable Law (including Laws in connection with the COVID-19 pandemic), Sellers shall carry on the Business in the Ordinary Course of Business, except to the extent otherwise agreed in writing by the Buyer, and shall use commercially reasonable efforts to preserve intact the Business, to keep available the services of the Employees, and to maintain their relations and goodwill with their vendors, suppliers, customers, distributors, and any others with whom or with which they have business relationships.  Notwithstanding the first sentence of this <u>Section 6.1</u>, during the Interim Period Sellers shall not, without the prior written consent of Buyer:

(a)    (i) other than in the Ordinary Course of Business, enter into, modify, amend, terminate, reject, waive any material rights or obligations under or otherwise seek to reject any Material Contract and Lease or take or omit to take any action that would result (with notice or lapse of time or both) in a default under any Material Contract or Lease or results in, or gives rise to a right with respect to, the termination of any Material Contract or Lease; or (ii) other than in the Ordinary Course of Business and as would not reasonably be expected to cause a Seller Material Adverse Effect, enter into, modify, amend, terminate, reject, waive any material rights or obligations under or otherwise seek to reject any Assumed Contract or take or omit to take any action that would result (with notice or lapse of time or both) in a default under any Assumed Contract or results in, or gives rise to a right with respect to, the termination of any Assumed Contract;

(b)    sell, transfer, convey, assign, lease, or otherwise dispose of any of the Acquired Assets or permit the Company to purchase any assets, in each case outside of the Ordinary Course of Business;

(c)    mortgage, pledge or subject to Liens (other than Permitted Liens) on the Acquired Assets and/or any of the assets of the Company or any part thereof;

(d)       amend, terminate, or renew any Contract or Lease other than in the Ordinary Course of Business;

(e)       enter into any agreement or commitment or engage in any transaction Relating to the Business which is not in the Ordinary Course of Business;

(f)       institute, settle, compromise or agree to settle any (i) material Proceeding (other than any contested matter or proceeding in or related to the Chapter 11 Cases) before any Governmental Entity relating to the Company (ii) any pending or threatened Claim that could give rise to Liabilities or could impose any binding obligation, whether contingent or realized, on the Company; provided that Sellers, and Sellers' insurance carriers, may settle, compromise or agree to settle any Proceeding, Claim, or matter covered by any insurance policy of Sellers, including, for the avoidance of doubt, any settlements, compromises or agreements to settle that fall within the deductible limits, without the consent of Buyer; or (iii) waive or release any claims or rights included in or related to the Acquired Assets with a value individually or in the aggregate in excess of $50,000;

(g)       engage any new Employee other than in the Ordinary Course of Business, or terminate any Employee other than in the Ordinary Course of Business or for cause;

(h)       other than in the Ordinary Course of Business or as otherwise approved by the Bankruptcy Court, increase the benefits of or compensation payable to (whether in the form of salary, bonus, or otherwise) any Employee, contractor or consultant of any Seller, or grant any bonus, benefit, payment (contingent or otherwise) or other direct or indirect compensation to any Employee, contractor or consultant of any Seller, including pursuant to the Incentive Plan;

(i)       license Intellectual Property Rights except for licenses in the Ordinary Course of Business;

(j)       take any action or fail to take any action required by this Agreement with the knowledge that such action or omission would result in any of the representations and warranties of Sellers in this Agreement becoming untrue in any respect;

(k)       enter into any Contract providing for capital expenditures with respect to the Business in an amount to be paid after the Closing of more than $50,000, individually, or $100,000, in the aggregate; and/or

(l)       authorize, commit, agree to or enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

6.2    Access.  Subject to applicable Law, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, data, books and records of Sellers to the extent relating to the Business, as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement,

(b) shall furnish to Buyer and its Representatives such financial, operating and property data to the extent relating to the Business and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Business, including access to facilities or other Acquired Assets and communication with customers and vendors as the case may be.  It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder.  Buyer agrees that any on-site inspections of any of Acquired Assets shall be conducted in the presence of Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Acquired Assets by Sellers, or operation of the Business, and shall not violate any applicable Law or confidentiality obligations of any Seller.

6.3    Public Announcements.  Buyer and Sellers will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the Transactions, but neither Buyer nor Sellers shall issue any press release without the prior written approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale Motion) or by obligations pursuant to any listing agreement with any national securities exchange and/or as required by any rules and/or regulations of the Securities and Exchange Commission, in which case the non-disclosing party will have the right to review and comment on such release, announcement or communication prior to publication; provided, that any such press release or public announcement shall not identify the Company's direct or indirect equity holders without the consent of such equity holders in their individual sole discretion.

6.4    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement and which constitute Assumed Liabilities shall be borne by Buyer. Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any Claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  Buyer or Sellers, as applicable, shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Parties hereto.  Buyer shall pay all such Transfer Taxes when due.

(b)    Each of Buyer, on the one hand, and Sellers, on the other hand, shall cooperate fully, as and to the extent reasonably requested, in connection with the preparation and filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes and shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

(c)     Subject to the terms of the Transition Services Agreement, all real and personal property Taxes, assessments, and similar governmental charges levied with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date shall be apportioned between the pre-Closing Tax period and the post-Closing Tax period as of the Closing Date on a per diem basis.  Thereafter, Sellers shall notify Buyer upon receipt of any bill for real or personal property Taxes or similar charges relating to the Acquired Assets, part or all of which are attributable to any post-Closing Tax period, and shall promptly deliver such Tax bill to Buyer, who shall pay the post-Closing portion of same to the appropriate Governmental Authority; provided that if such bill covers the pre-Closing period, Sellers shall also remit to Buyer, prior to the due date of such Tax bill, payment for the proportionate amount of such bill that is attributable to the pre-Closing period.  If either Sellers or Buyer shall make a payment which such Party is entitled to have made by the other Party under this Section, such other Party shall promptly make reimbursement (but in no event later than fifteen (15) Business Days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Any payment required under this Section shall bear interest at the rate per annum determined, from time to time, under the provisions of Section 6621(a)(2) of the Code for each day until paid.

6.5     <u>Commercially Reasonable Efforts</u>.

(a)     Subject to the terms and conditions of this Agreement and the Transition Services Agreement, each Party shall use its commercially reasonably efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will use their respective reasonable best efforts to (i) take all actions necessary to transfer the Acquired Assets, (ii) take all actions necessary to cause all conditions set forth in <u>Article 7</u> to be satisfied as soon as practicable, (iii) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (iv) effect all necessary registration, applications, notices and other filings required by applicable Law,  including, as applicable to Sellers, under the Bankruptcy Code, (v) obtain any third party consents necessary to consummate the Transactions, including all necessary Governmental Authorizations, and (vi) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement.  Buyer shall not and shall cause its Subsidiaries and Affiliates not to, take any action that would reasonably be expected to prevent or materially delay the approval of any Governmental Entity of any of the filings referred to in this <u>Section 6.5(a)</u>.

(b)     To the extent Buyer comes into the possession of any Personally Identifiable Information, except as expected in the Ordinary Course of Business, Buyer shall immediately deliver such information to Sellers and destroy and/or delete all copies of such information and provide Sellers with evidence of such destruction.

6.6     <u>Further Assurances</u>.  Without further consideration, from and after the Closing, the Parties agree to, at the requested Party's sole cost and expense, (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for

the purpose of carrying out the intent of this Agreement and the Transaction Documents; provided that nothing in this Section 6.6 or this Agreement shall prohibit Seller from ceasing operations or winding up their affairs following the transfer of all Acquired Assets to Buyer.

6.7    Bankruptcy Court Matters.

(a)    Buyer and Sellers acknowledge that this Agreement and the Transactions contemplated hereby are subject to the Bidding Procedures and approval by the Bankruptcy Court and, as applicable, entry of the Bidding Procedures Order and Sale Order.  In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and Sale Order shall govern.

(b)    Subject to Sellers' obligations to comply with any order of the Bankruptcy Court, Sellers and Buyer will promptly make all filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the Transactions.  Sellers shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Sellers propose to file with the Bankruptcy Court which relate to this Agreement or the Transactions and will provide Buyer with reasonable opportunity to review such filings.  Sellers will also promptly provide Buyer with written notice and copies of any other or further notice of appeal, motion, or application filed in connection with any appeal from or application for reconsideration of, any of such orders and any related briefs.

(c)    From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or, if Buyer is the Successful Bidder at the Auction, the Sale Order.  Buyer has not colluded in connection with its offer or negotiation of this Agreement.  From and after the date hereof, Buyer shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order, or if Buyer is the Successful Bidder at the Auction, the Sale Order or consummation of the Transactions.

(d)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(e)    Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan Sellers submit to the Bankruptcy Court, or any other court for confirmation or sanction, shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the Transactions.

(f)    If an Auction is conducted, and Buyer is not the Successful Bidder for the Acquired Assets, Buyer shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Buyer is the next highest or otherwise best bidder for the

Acquired Assets at the Auction (the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder, the "Back-Up Bidder") and, if Buyer is the Back-Up Bidder, Buyer shall, notwithstanding Section 8.1(b)(ii), be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) open and irrevocable until the first to occur of the Outside Date or the date this Agreement is otherwise terminated pursuant to Article 8. Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Buyer, if Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Sellers may seek authority to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) with the Back-Up Bidder.

6.8    Cure Costs.  Subject to Section 2.5, Sellers shall sell, transfer and assign, all Assumed Contracts and Assumed Leases to Buyer, and Buyer shall purchase and assume all Assumed Contracts and Assumed Leases from Sellers, as of the Closing Date pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order.  In connection with debts incurred or the assignment and assumption of the Assumed Contracts and Assumed Leases, Buyer shall cure any monetary defaults of the debts incurred or under the Assumed Contracts and Assumed Leases by payment of any Cure Costs as determined in accordance with the Bidding Procedures Order and Sale Order; provided, however, that if an Assumed Contract or Assumed Lease is not assumed and assigned on the Closing Date pursuant to Section 2.5(e), Buyer shall pay Cure Costs as soon as practicable after (i) Sellers obtain the Consent or Governmental Authorization for the applicable Delayed Contract and (ii) the assumption and assignment of an Assumed Contract or Assumed Lease.  Buyer shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts and Assumed Leases

6.9    Preservation of Books and Records.  For a period of three (3) years after the Closing Date, Buyer shall provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without undue interference to the business operations of Buyer, and at Sellers' sole cost and expense) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets, to the extent necessary to permit Sellers to determine any matter relating to their rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Sellers in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the later of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law,  (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) such three (3) year period.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Acquired Assets for periods prior to the Closing.  To the extent that any books and records Related to the Business, the Acquired Assets, or the Assumed Liabilities do not constitute Acquired Assets, Sellers (or any subsequently appointed representative of their bankruptcy estates) shall preserve such books and records relating to the pre-Closing Business for a period of six (6) months from the date on which all Acquired Assets have been transferred

pursuant to this Agreement and the other Transaction Documents, and shall make such books and records available to Buyer, at Buyer's sole cost and expense, as may be reasonably required by Buyer in connection with, among other things, any insurance claims, legal proceedings, Tax audits, or governmental investigations, or in order to allow Buyer to comply with its obligations under this Agreement and the other Transaction Documents.

6.10    <u>Notification of Certain Matters</u>.  To the extent permitted by applicable Law, Sellers and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the Transactions set forth in <u>Article 7</u> not to be satisfied as of any date, including the breach of any representation, warranty, or covenant in this Agreement, (b) any notice or other communication from any Person asserting that the consent of such Person which is or may be required in connection with the Transactions is not likely to be obtained prior to Closing or any written objection or proceeding challenging the Transactions or the entry of the approval by the Bankruptcy Court, or (c) the receipt of any notice or other communication from any Governmental Entity in connection with the Transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that the delivery of any such notice pursuant to this <u>Section 6.10</u> shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.  Subject to (i) any confidentiality provisions binding the Sellers and (ii) restrictions of access to classified information, Sellers shall permit Buyer or its Representatives to review in advance any proposed material written or material oral communication or information submitted to any Governmental Entity in connection with the Transactions, shall furnish Buyer with copies of all correspondence, filings and communications with any Governmental Entity, and shall not agree to participate in any meeting with any Governmental Entity related to the Transactions unless Sellers consult with Buyer in advance and, to the extent permitted by any such Governmental Entity, give Buyer the opportunity to attend and participate in such meeting, in each case to the maximum extent practicable and in accordance with applicable Law.  Each Party shall furnish the other Party with such necessary information and assistance as such other Party may reasonably request in connection with their preparation of filings, registrations, requests or submissions of information to any Governmental Entity in connection with this Agreement and the Transactions; <u>provided</u>, <u>however</u>, that Sellers may withhold such information if Sellers determine that such disclosure thereof would violate (i) any confidentiality provisions binding on the Sellers or (ii) any restrictions of access to classified information.

6.11    <u>Confidentiality</u>.

(a)    From and after the Closing, Sellers shall keep confidential all non-public information regarding the Acquired Assets, except for (i) such public disclosure as Sellers and their counsel may reasonably determine to be required under any applicable Law, regulation, or Order (<u>provided</u> that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable Law and, where applicable and reasonably requested by Buyer and at Buyer's sole cost and expense, Sellers will use commercially reasonable efforts to cooperate with Buyer to obtain a protective order or other confidential treatment or otherwise limit the scope of information that is required to be disclosed, and Sellers shall only disclose that portion of such information as Sellers are advised by their counsel in writing is required to be disclosed) and (ii)

disclosure to its representatives (including any prospective or actual financing sources, whether debt or equity) solely to the extent that such parties need to know such information and agree to be bound by confidentiality obligations no less protective than those set forth in this Section 6.11(a).

(b)     The Parties hereby acknowledge and agree that the Confidentiality Agreement is enforceable in accordance with its terms, it being understood and agreed, however, that Buyer's obligations thereunder related to Confidential Information (as defined therein) that constitutes an Acquired Asset or Assumed Liability shall terminate automatically effective as of the Closing.

6.12    Employees.

(a)     Subject to the terms and conditions of the Transition Services Agreement and entry of the Sale Order, no later than five (5) days prior to the Closing Date, Buyer shall, or shall cause its designated Affiliate or Affiliates, to extend offers of employment to all of Sellers' employees as of the Agreement Date who have not been terminated or otherwise left the employ of Sellers prior to the Closing Date.  Sellers will make available to Buyer a correct and complete list of all their current employees as of ten (10) days prior to the Closing Date and, on or around the Petition Date, shall use reasonable efforts to inform all Employees, in a manner reasonably acceptable to Buyer, of Buyer's intention to extend offers of employment on the terms set forth this Section 6.12 and contingent upon the Closing of the sale to Buyer. Each Employee who accepts such offer shall be deemed a "Transferred Employee".  Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing, and with respect to each of the Employees who is then employed by Sellers, Buyer shall make commercially reasonable efforts to keep such employment at the same location, at the same base wage or hourly rate, with employee benefits which are substantially comparable in the aggregate and on the same terms and conditions of employment as in effect immediately prior to the Closing.  Buyer shall give each Transferred Employee credit for years of service with Sellers for purposes of determining compensation time under new employment with Buyer.  Additionally, during the six (6) month period following the Closing, Buyer shall (i) reasonably evaluate each Transferred Employee for participation in any management equity incentive pool which Buyer, in consultation with the Company's management, may choose to establish, and (ii) grant a profits interest, or equivalent equity incentive, from such pool to such key Transferred Employees as determined by Buyer in its commercially reasonable discretion in consultation with the Company's management.  To the extent permitted by Law, Sellers shall deliver a notice, which, at the option of Buyer, may be a joint notice by Buyer and Sellers, to each of the Transferred Employees in a form reasonably satisfactory to Buyer (i) informing such Transferred Employees about the sale of the Acquired Assets to Buyer, and (ii) terminating their employment with Sellers. Sellers shall permit Buyer to concurrently send a notice to each of the Transferred Employees in a form reasonably satisfactory to Sellers describing their offer of employment by Buyer, if any, and providing contact information for any questions.

(b)     Buyer (or its designated Affiliate) shall assume the Assumed Benefit Plans. Buyer, on the one hand, and Sellers, on the other, shall take such actions as are necessary and reasonably requested by the other Party to cause Buyer (or its designated Affiliate) to assume sponsorship of the Assumed Benefit Plans as of the Closing and to effect the transfer of all assets and benefit liabilities of the Assumed Benefit Plans together with all related trust, insurance

policies and administrative services agreements, effective as soon as practicable following the Closing, subject to the terms of the Transition Services Agreement. Buyer will not become a participating company in any of the Benefit Plans provided by Sellers by virtue of purchasing the Acquired Assets and operating the Business and will have no liability for any of the benefits provided under any of the Sellers' Benefit Plans, other than the Assumed Benefit Plans or as may be required by applicable Law.

(c)    No provision of this Section 6.12 shall be deemed to (i) guarantee employment for any period of time for, or preclude the ability of Buyer to terminate, any Transferred Employee, other employee or other service provider for any reason, (ii) confer upon any Person (including any current or former director, officer or employee of, or consultant or independent contractor to, Buyer or any of its Subsidiaries) any third party beneficiary or other rights or remedies, or (iii) constitute an amendment to any Benefit Plan of Buyer or Sellers.

6.13    Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code and to the extent provided for in the Sale Order, the transfer of the Acquired Assets shall be free and clear of any Liens on the Acquired Assets (except Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

6.14    Collection of Accounts Receivable.  As of the Closing Date, Sellers hereby (a) authorize Buyer to open any and all mail addressed to Sellers and delivered to the Leased Premises; and (b) appoint Buyer as their attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments which constitute Acquired Assets which are made payable or endorsed to any Seller or any Seller's order, for Buyer's own account.

6.15    Use of Name and Marks.  As of the Closing Date, neither Sellers nor any of their Affiliates shall use, license or authorize any third party to use any name, slogan, logo or trademark in such a manner which is likely to cause confusion or mistake with the names, trademarks, or service marks included in the Transferred Intellectual Property, subject to the terms of the Transition Services Agreement.

6.16    No Successor Liability.  Except as otherwise expressly ordered by the Bankruptcy Court, the Parties intend that, to the fullest extent permitted by Law, including under section 363 of the Bankruptcy Code, upon the Closing, Buyer shall not and shall not be deemed to:  (a) be a successor (or other such similarly situated party) to Sellers, including a "successor employer" for purposes of the Code, ERISA, or other applicable Laws; (b) have any responsibility or Liability for any obligations of any Seller, except as otherwise provided in this Agreement, based on any theory of successor liability or any similar theory; (c) have, de facto or otherwise, merged with or into any Seller; (d) be an alter ego or mere continuation or substantial continuation of any Seller (and there is no continuity of enterprise between Buyer and any Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, products liability, or other Law, rule, regulation, or doctrine; or (e) be holding itself out to the public as a continuation of any Seller or its estate.  The Buyer

acknowledges and agrees that this Section 6.16 shall not in any way be deemed to modify or contract the Buyer's obligations with respect to Assumed Liabilities.

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

7.1    Conditions Precedent to Obligations of Buyer.    The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Accuracy of Representations and Warranties.    The representations and warranties of Sellers set forth in Article 4 shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Seller Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct would not reasonably be expected to have a Seller Material Adverse Effect, as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    Performance of Obligations.    Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date, including all deliveries required under Section 3.1(b).

(c)    Sale Order.    The Bankruptcy Court shall have entered the Sale Order on or before June 22, 2022, and no Order staying, reversing, modifying or amending such Sale Order shall be in effect on the Closing Date.

(d)    Assignment of Material Contracts.    As of the Closing Date, Sellers shall have obtained, pursuant to the Sale Order or otherwise, authorization to assign to Buyer all Material Contracts, except for those Material Contracts that constitute Delayed Contracts and that cannot be assigned to Buyer as of the Closing Date because the applicable Governmental Authorization has not yet been obtained.

(e)    Acceptance to Counsel to Buyer.    The form and substance of all legal matters contemplated hereby and of all documents and instruments delivered hereunder shall be reasonably acceptable to Buyer's counsel.

(f)    No Business Change.    No change shall have occurred or be threatened regarding the Business, the Acquired Assets or the Assumed Liabilities which could be reasonably likely to have a Seller Material Adverse Effect.

(g)    Officer's Certificate.    Buyer shall have received a certificate, dated the Closing Date, of a duly authorized executive officer of each Seller to the effect that the conditions specified in Section 7.1(a), and Section 7.1(b) above have been fulfilled.

(h)    No Order.    No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has

not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

7.2    <u>Conditions Precedent to the Obligations of Sellers</u>.  The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

(a)    <u>Accuracy of Representations and Warranties</u>.    The representations and warranties of Buyer (i) set forth in <u>Section 5.1</u> (*Organization*) and <u>Section 5.2</u> (*Due Authorization*), shall be true and correct in all material respects, and (ii) set forth in <u>Article 5</u> (other than those described in <u>clause (i)</u>) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Buyer Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct would not reasonably be expected to have a Buyer Material Adverse Effect, in the case of each of <u>clauses (i)</u> and <u>(ii)</u>, as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    <u>Performance of Obligations</u>.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date, including all deliveries required under Section 3.1(c).

(c)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending such Sale Order shall be in effect on the Closing Date.

(d)    <u>Officer's Certificate</u>.  Sellers shall have received a certificate, dated the Closing Date, of a duly authorized executive officer of Buyer to the effect that the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> above have been fulfilled.

(e)    <u>No Order</u>.  No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

7.3    <u>Frustration of Conditions Precedent</u>.  Neither Buyer nor Sellers may rely on the failure of any condition set forth in this <u>Article 7</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions contemplated hereby.

## ARTICLE 8
## TERMINATION

8.1    <u>Termination of Agreement</u>.    This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)    by mutual written agreement of Sellers and Buyer;

(b)      by either Sellers or Buyer:

(i)      if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final; provided, however, that no termination may be made by a Party under this Section 8.1(b)(i) if the issuance of such Order was caused by the material breach of any representations, warranties, covenants or agreements contained in this Agreement by such Party; or

(ii)      upon Sellers' written agreement to enter into an Alternative Transaction.

(c)      by Buyer by giving written notice to each Seller if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that would prevent the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) twenty (20) days after receipt of Buyer's notice of such breach, and (B) the Outside Date; provided, that Buyer shall not have a right of termination pursuant to this Section 8.1(c) if Sellers could, at such time, terminate this Agreement pursuant to Section 8.1(i);

(d)      by Buyer, if (i) the Sale Order shall not have been entered by the deadline set forth in this Agreement, or (ii) at any time after entry of the DIP Order, the Bidding Procedures Order, and the Sale Order, such Orders are reversed, stayed for more than fourteen (14) days, vacated or modified to the extent such modifications are reasonably expected to have a Seller Material Adverse Effect;

(e)      by Buyer, if the Bankruptcy Court enters an order dismissing, or converting into a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner under Bankruptcy Code section 1106(b);

(f)      by Buyer, upon occurrence of any Seller Material Adverse Effect;

(g)      by Buyer if (i) Sellers consummate an Alternative Transaction, or (ii) Buyer is neither the Successful Bidder nor the Back-Up Bidder following the Auction;

(h)      by Buyer or Sellers if the Closing shall not have occurred on or before the Outside Date, provided, however that no termination may be made a Party under this Section 8.1(h) if the failure to close on or before the Outside Date was caused by the material breach of any representations, warranties, covenants or agreements contained in this Agreement by such Party;

(i)      by Sellers by giving written notice to Buyer if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that would prevent the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by Sellers, or, if such breach is curable, cured by such Buyer prior to the earlier to occur of (A) twenty (20) days after receipt of Sellers' notice of such breach, and (B) the Outside Date; provided, that Sellers shall not

45

have a right of termination pursuant to this Section 8.1(i) if Buyers could, at such time, terminate this Agreement pursuant to Section 8.1(c);

(j)        by Sellers if the governing body of Sellers determines, upon advice from outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would violate its or such governing body's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction.  For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Section 8.1), Sellers retain the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estates; or

(k)        by Sellers if within two days prior to the Closing Date, the Sellers obtain an order from the Bankruptcy Court to terminate this Agreement on the grounds of insufficient progress being made toward closing on an emergency basis. Buyer reserves the right to oppose this request.

Each condition set forth in this Section 8.1 pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this Section 8.1 is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

8.2    Consequences of Termination.  In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 6.3 (*Public Announcements*), Section 6.7(f), this Section 8.2 (*Consequences of Termination*) and Article 9 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action or Liability of any of the Parties hereto, except that such termination shall not relieve any Party of any Liability for Fraud or breach of this Agreement prior to such termination; provided that, notwithstanding anything to the contrary herein, subject to Section 9.10(d), (i) the sole and exclusive remedies of Buyer for any breach of this Agreement by Sellers shall be, if applicable, to terminate this Agreement pursuant to Section 8.1(c), and (ii) in no event shall Sellers be liable for monetary damages in connection with this Agreement and the Transactions.

## ARTICLE 9
## MISCELLANEOUS

9.1    Expenses.  Each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

9.2    Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided that Buyer may, without the consent of any other party, assign this Agreement and its rights and obligations hereunder in whole or in part to any Affiliate;

provided further, that Buyer shall remain jointly and severally liable with such Affiliate for Buyer's obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

9.3    Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estates), Buyer and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4    Notices.    All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; provided that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to any Seller: | EYP Group Holdings, Inc. |
| | 201 Fuller Road, 5th Floor |
| | Albany, New York 12203 |
| | Attention: Kefalari L. Mason |
| | Email: kmason@eypae.com |
| | |
| With copies to: | DLA Piper LLP (US) |
| | 444 West Lake Street |
| | Chicago, Illinois 60606 |
| | Attention:    Richard A. Chesley |
| | Email:    richard.chesley@us.dlapiper.com |
| | |
| If to Buyer: | Page Southerland Page, Inc. |
| | 1615 M Street, NWN Suite 700 |
| | Washington, DC 20036 |
| | Attention:    Thomas McCarthy |
| | Email:    tmccarthy@pagethink.com |

With copies to:    Chamberlain, Hrdlicka, White, Williams & Aughtry P.C.
1200 Smith Street, Suite 1400
Houston, TX 77079
Attention:    Jarrod Martin
    Habeeb I. Gnaim
Email:    jarrod.martin@chamberlainlaw.com
    h.gnaim@chamberlainlaw.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5    <u>Choice of Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement, the Disclosure Schedules, the Exhibits hereto, the Sale Order, and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7    <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be executed via physical or electronic signature and delivered via facsimile, electronic mail, or other means of electronic transmission.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.8    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.9    Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.10    Exclusive Jurisdiction; Specific Performance.

(a)    Subject to Section 9.10(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.4.  For the avoidance of doubt, this Section 9.10 shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)    Notwithstanding anything herein to the contrary, in the event the Chapter 11 Cases of Sellers are closed or dismissed, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the District of Delaware or, if that court does not have subject matter jurisdiction, in any state court located in Delaware (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

(c)    Buyer acknowledges that Sellers would be damaged irreparably in the event that the terms of this Agreement are not performed by Buyer in accordance with its specific terms or otherwise breached or Buyer fails to consummate the Closing and that, in addition to any other remedy that Sellers may have under law or equity, Sellers shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Buyer.  Buyer further agrees that Sellers shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.10, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

(d)    Sellers acknowledge that Buyer would be damaged irreparably in the event that the terms of this Agreement are not performed by Sellers in accordance with its specific terms or otherwise breached or Sellers fail to consummate the Closing and that, in addition to any other remedy that Buyer may have under law or equity, Buyer shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Sellers.  Sellers further agree that Buyer shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.10, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

9.11    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.11 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.12    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing (each, a "Post-Closing Covenant")) shall expire and be of no further force and effect as of the Closing.  Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, sixty (60) days following the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

9.13    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Seller or the Chapter 11 Cases, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.14    Time of Essence.  Time is of the essence of this Agreement.

9.15    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Buyer or Sellers shall have any Liability for any Liabilities of Buyer or Sellers, respectively, under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.  This Agreement may only be enforced against, and any Claim, action (including in the Chapter 11 Case), suit, Proceeding or investigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.

9.16    Disclosure Schedules.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context

otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement. The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates; provided, however, that any information set forth in one Schedule to the Disclosure Schedules will be deemed to apply to each other section or subsection thereof to which its relevance is reasonably apparent on its face. From the Agreement Date to three (3) Business Days prior to the Closing, Sellers have the continuing obligation to (a) promptly supplement, modify, or amend the information set forth on the Disclosure Schedules with respect to any matter hereafter arising or discovered after the Agreement Date which, if existing or known at the Agreement Date, would have been required to have been set forth on such Disclosure Schedules, and (b) if necessary or appropriate to correct any inaccuracy in a representation made by Sellers resulting from any matter hereafter arising or discovered after the Agreement Date, to promptly add a schedule to the Disclosure Schedules with a corresponding reference in this Agreement (such hereafter arising or discovered information, the "Updating Information"). Sellers shall provide Buyer written notice within two (2) Business Days of becoming aware of the need for any Updating Information.

9.17    Sellers' Representative; Dealings Among Sellers. By its execution and delivery of this Agreement, each Seller hereby irrevocably constitutes and appoints EYP as its true and lawful agent and attorney-in-fact (the "Sellers' Representative"), with full power of substitution to act in such Seller's name, place and stead with respect to all Transactions and all terms and provisions of this Agreement, and to act on such Seller's behalf in any Proceeding, and to do or refrain from doing all such further acts and things, and execute all such documents as Sellers' Representative shall deem necessary or appropriate in connection with the Transactions. The appointment of Sellers' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, its Affiliates and any other Person may conclusively and absolutely rely, without inquiry, upon any action of Sellers' Representative on behalf of Sellers in all matters referred to herein or contemplated hereby including any direction regarding the amount of any payment to any Seller. Buyer shall have no obligation of any nature whatsoever for determining any allocation of any payments among Sellers. Without limiting the generality of the foregoing, absent specific direction by Sellers' Representative, Buyer shall be deemed to have fulfilled its obligations hereunder absolutely with respect to any amounts payable by it under or pursuant to this Agreement or the delivery of any instruments if Buyer shall pay any such amounts or deliver such instruments to Sellers' Representative. All Notices delivered by Buyer (whether prior to or following the Closing) to Sellers' Representative (whether pursuant hereto or otherwise) for the benefit of Sellers shall constitute valid and timely Notice to all of Sellers.

9.18    Mutual Drafting. This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

9.19    Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions contemplated hereby, without limiting in any way Buyer's rights and remedies set forth in this Agreement, will require Sellers or any of its governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

_[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

<u>**BUYER**</u>:

**PAGE SOUTHERLAND PAGE, INC.**

By: _____

Name: Thomas McCarthy
Title:   Chief Executive Officer

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

### SELLER:

**EYP GROUP HOLDINGS, INC.,**
a Delaware corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer

**EYP HOLDINGS, INC.,**
a Delaware corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer

**EYP, INC.,**
a Massachusetts corporation

By:_____

Name: Kefalari Mason
Title: Authorized Officer

**EYP ARCHITECTURE & ENGINEERING, P.C.,**
a New York professional corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer

*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

**EYP ARCHITECTURE & ENGINEERING OF CT, INC.,**
a Connecticut corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer


**EYP ARCHITECTURE & ENGINEERING OF NJ, INC.,**
a New Jersey corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer


**EYPAE, INC**.,
a Massachusetts corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer


**WHR ARCHITECTURE, PC**,
a Texas professional corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer


**WHR DESIGN, P.C**.,
a Texas professional corporation

By: _____

Name: Kefalari Mason
Title: Authorized Officer


*[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]*

## Exhibit A

**Bidding Procedures**

**[Intentionally Omitted]**

**Exhibit B**
**(Form of Bill of Sale)**

EXHIBIT B – FORM OF BILL OF SALE

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of June 30, 2022 (the "Closing Date"), by and between EYP Group Holdings, Inc. and its subsidiaries and affiliates signatory hereto (the "Sellers" or "Assignors"), as debtors in possession of their respective bankruptcy estates (each, an "Estate" and collectively, the "Estates") of *EYP Group Holdings, Inc. et al*., Case No. 22-10367 (MFW), and Page Southerland Page, Inc., the designated assignee (the "Buyer" or "Assignee"). Assignor and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, this Agreement is being delivered in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of June 30, 2022, by and among the Assignors, as debtors in possession and Sellers, and Assignee, as Buyer (the "Purchase Agreement");

WHEREAS, on [_], 2022, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the *Order (a) Approving and Authorizing the Sale of Substantially all of the Debtors' Assets Pursuant to Purchaser's Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (b) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (c) Granting Related Relief* [D.I. [_]] (the "Sale Order");

WHEREAS, pursuant to the Purchase Agreement and in accordance with the Sale Order, each Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee, and Assignee has agreed to purchase, acquire and accept from each such Assignor, all of the applicable Estates' direct or indirect right, title and interest in, to and under certain assets, liabilities and contractual relationships; and

WHEREAS, this Agreement, as duly executed by Assignee and each Assignor, is being delivered as of the date hereof by each Party to the other Parties effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained and intending to be legally bound hereby, Assignee and each Assignor do hereby agree as follows:

## BILL OF SALE; ASSIGNMENT AND ASSUMPTION

1.1.    Definitions.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Purchase Agreement.

1.2.    Transfer, Assignment and Assumption of Assets.  In accordance with and subject to the terms of the Purchase Agreement, each Assignor does hereby unconditionally and irrevocably sell, transfer, assign, convey and deliver to Assignee, its successors and assigns forever, and Assignee does hereby purchase, acquire, assume and accept from each such Assignor, effective as of the Closing, all of the respective Estate's right, title and interest in, to and under the Acquired Assets, as provided in Sections 1.1 and 2.1 of the Purchase Agreement, free and clear of all Liens, Claims and encumbrances, except as provided in the Purchase Agreement.

1.3.    Excluded Assets.  In accordance with and subject to the terms of the Purchase Agreement, each Assignor excepts, reserves and excludes all of such Assignor's right, title and interest in, to and under

EXHIBIT B – FORM OF BILL OF SALE

the Excluded Assets, as provided in <u>Section 1.1</u> of the Purchase Agreement, and Assignee does not purchase, acquire, or accept from any Assignor any Excluded Assets.

1.4.    <u>Assumed Liabilities</u>.    In accordance with and subject to the terms of the Purchase Agreement, Assignee, effective as of the Closing and only upon the Closing, does hereby assume, and does hereby agree to discharge and perform when due any and all Assumed Liabilities to the extent provided in <u>Sections 1.1 and 2.2</u> of the Purchase Agreement.

1.5.    <u>Excluded Liabilities</u>.    In accordance with and subject to the terms of the Purchase Agreement, effective as of the Closing and to the extent provided in <u>Sections 1.1 and 2.3</u> of the Purchase Agreement, Assignee shall not assume, be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any Liabilities other than the Assumed Liabilities.

**MISCELLANEOUS**

1.6.    <u>Purchase Agreement</u>.    This Agreement is expressly made subject to the terms of the Purchase Agreement.  The delivery of this Agreement shall not amend, affect, enlarge, diminish, supersede, modify, replace, rescind, waive or otherwise impair any of the representations, warranties, covenants, terms or provisions of the Purchase Agreement or any of the rights, remedies or obligations of each Assignor or Assignee provided for therein or arising therefrom in any way, all of which shall remain in full force and effect in accordance with their terms.  The representations, warranties, covenants, terms and provisions contained in the Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement shall control.

1.7.    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each Assignor, Assignee, and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

1.8.    <u>Further Assurances</u>.  From time to time hereafter, and subject to the terms of the Purchase Agreement, Assignors, while they have the capacity to do so, shall use reasonable efforts to take such steps and actions and provide such cooperation and assistance to Assignee, or its successors or assigns, including the execution and delivery of any further documents that are reasonably requested by Assignee, or its successors or assigns, to sell, transfer, convey, assign, grant and deliver to Assignee, or its successors or assigns, and to confirm the right, title and interest of Assignee, or its successors or assigns, in and to the Acquired Assets.

1.9.    <u>Attorney in Fact</u>.  Each Assignor does hereby irrevocably constitute and appoint Assignee, its successors and assigns, its true and lawful attorney, with full power of substitution, in its name or otherwise, and on behalf of each Assignor, for its own use, to claim, demand, collect and receive at any time and from time to time any and all Acquired Assets hereby sold, transferred, assigned, conveyed and delivered, or intended so to be, and to prosecute the same at law or in equity any, upon discharge thereof, to complete, execute and deliver any and all necessary instruments of satisfaction and release.

1.10.    <u>Amendments and Waivers</u>.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Assignee and each applicable Assignor, or in the case of a waiver, by the Party

EXHIBIT B – FORM OF BILL OF SALE

waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

    1.11. <u>Severability</u>. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

    1.12. <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the United States of America and the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code. The Parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court and waive any right to a jury trial regarding the same.

    1.13. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Except as otherwise provided in the Purchase Agreement, this Agreement and the rights and obligations hereunder shall not be assignable by any Assignor without the prior written consent of Assignee, and any such purported assignment without such consent shall be void. Except as otherwise provided in the Purchase Agreement, this Agreement and the rights and obligations hereunder shall be assignable by Assignee without the written consent of any Assignor.

    1.14. <u>Headings</u>. The headings of the sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

    1.15. <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed counterpart of this Agreement.

    1.16. <u>Notices</u>. Any notice given pursuant to this Agreement shall be given in the same manner as stated in <u>Section 9.4</u> of the Purchase Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**<u>ASSIGNORS</u>:**

**EYP GROUP HOLDINGS, INC.,**
a Delaware corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYP HOLDINGS, INC.,**
a Delaware corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYP, INC.,**
a Massachusetts corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYP ARCHITECTURE & ENGINEERING, P.C.,**
a New York professional corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

EXHIBIT B – FORM OF BILL OF SALE

**EYP ARCHITECTURE & ENGINEERING OF CT, INC.,**
a Connecticut corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYP ARCHITECTURE & ENGINEERING OF NJ, INC.,**
a New Jersey corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYPAE, INC**., 
a Massachusetts corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**WHR ARCHITECTURE, PC**,
a Texas professional corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**WHR DESIGN, P.C.**,
a Texas professional corporation

By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**ASSIGNEE:**

**PAGE SOUTHERLAND PAGE, INC.,**
a Delaware corporation


By: _____
       Name: Thomas McCarthy
       Title:   Chief Executive Officer

**<u>Exhibit C</u>**
**(IP Assignment and Assumption Agreement)**

## IP ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS IP ASSIGNMENT AND ASSUMPTION AGREEMENT (this "IP Assignment"), dated as of June 30, 2022, by and between Page Southerland Page, Inc. ("Assignee"), and EYP Group Holdings, Inc. and its subsidiaries and affiliates signatory hereto (each, an "Assignor" and collectively, "Assignors").

WHEREAS, this IP Assignment is made and entered into in connection with the Closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of June 30, 2022 by and among the Assignors, as debtors in possession and Sellers, and Assignee, as Buyer (the "Purchase Agreement");

WHEREAS, on [_], 2022, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the *Order (a) Approving and Authorizing the Sale of Substantially all of the Debtors' Assets Pursuant to Purchaser's Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (b) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (c) Granting Related Relief* [D.I. [_]] (the "Sale Order"); and

WHEREAS, pursuant to the Purchase Agreement and in accordance with the Sale Order, Assignee desires to acquire Assignors' entire right, title and interest in, to and under the certain intellectual property assets, together with the goodwill associated therewith.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth below and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Defined Terms.  All capitalized terms not defined herein shall have the meaning assigned to them in the Purchase Agreement.

2. Assignment.  Subject to the terms and conditions of the Purchase Agreement, each Assignor does hereby irrevocably and unconditionally sell, assign, transfer, deliver, and convey to Assignee, and Assignee does hereby purchase, acquire and accept from such Assignor, all of such Assignor's right, title, and interest in, to, and under the Transferred Intellectual Property, including, without limitation, the intellectual property rights set forth on Exhibit 1 hereto, and the goodwill and all rights associated therewith, and all other corresponding rights that are or may be secured under the laws of the United States, any jurisdiction thereof, any foreign country or any multinational jurisdiction now or hereafter in effect, the same to be held by Assignee for Assignee's own use and enjoyment and for the use and enjoyment of Assignee's successors and assigns and other legal representatives, together with all rights to income, royalties, and license fees deriving from the Transferred Intellectual Property, all claims for damages by reason of past, present and future infringements, or unauthorized uses of the Transferred Intellectual Property and the right to sue for and collect such damages, as permitted under the applicable laws of any jurisdiction or country in which such claims may be asserted for the use and benefit of Assignee and each of Assignee's successors, assigns and other legal representatives.  The foregoing assignment includes the right of priority to file and prosecute corresponding applications for any of the Transferred Intellectual Property in any and all jurisdictions through the world, the rights to all patents which may be granted from any patent applications in the Transferred Intellectual Property, and the rights to any divisionals, renewals, continuations, continuations-in-part, reissues, reexaminations, and extensions with respect to any patents or patent applications in the Transferred Intellectual Property.  To

the extent any intent-to-use applications for trademarks are included in the Transferred Intellectual Property, such intent-to-use applications are being assigned as part of the entire business or portion thereof to which the mark pertains, as required by Section 10 of the Trademark Act, 15 U.S.C. 1060.

3.    <u>Waiver of Moral Rights</u>.  To the full extent permissible under applicable law, each Assignor hereby irrevocably and unconditionally assigns to Assignee and waives and agrees never to assert or enforce any Moral Rights (as defined below) in or with respect to any and all of the Transferred Intellectual Property that may exist anywhere in the world, together with all claims for damages and other remedies asserted on the basis of Moral Rights.  "<u>Moral Rights</u>" means any right to claim authorship to or to object to any distortion, mutilation, or other modification or other derogatory action in relation to a work, whether or not such action would be prejudicial to the author's reputation, and any similar right, existing under common or statutory law of any country in the world or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."  To the extent any Assignor retains any such Moral Right under applicable law, and to the extent permitted by applicable law, Assignor hereby ratifies and consents to any action that may be taken by Assignee with respect to such Moral Rights, and agrees to confirm any such ratifications, consents and agreements from time to time as requested by Assignee while each Assignor has the capacity to do so.

4.    <u>Assistance</u>.    Each Assignor further agrees that should additional or further documentation of the foregoing assignment or further acts be required to protect, secure, vest, and record good title to the Transferred Intellectual Property in Assignee, Assignors will execute such other documents or take such further acts as may be reasonably necessary upon Assignee's reasonable request.

5.    <u>Attorney in Fact</u>.  Each Assignor does hereby irrevocably constitute and appoint Assignee, its successors and assigns, its true and lawful attorney, with full power of substitution, in its name or otherwise, and on behalf of each Assignor, as its agent and attorney in fact to act in each Assignor's stead to execute, acknowledge, verify, and delivery and formal assignment recordation documents for the U.S. Patent and Trademark Office and any applicable foreign equivalent, with the same legal force and effect as if done by any Assignor.

6.    <u>Relation to Purchase Agreement</u>.   In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern and control.

7.    <u>General</u>.

7.1    <u>Severability; Amendment</u>.  Any provision in this IP Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.  This IP Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of the parties hereto.

7.2    <u>Governing Law</u>.  This IP Assignment shall be governed and construed in accordance with federal bankruptcy law and federal intellectual property law, to the extent applicable, and where state law is implicated, the laws of the State of Delaware (without giving reference to the principles of conflicts of law).

7.3    <u>Counterparts</u>.   This IP Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document.   Counterparts of this IP Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

7.4    <u>Notices</u>.  Any notices to be delivered in connection with this IP Assignment shall be made in accordance with <u>Section 9.4</u> of the Purchase Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have caused this IP Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

<u>**ASSIGNORS:**</u>

**EYP GROUP HOLDINGS, INC.,**
a Delaware corporation


By: _____
        Name: Kefalari Mason
        Title: Authorized Officer


**EYP HOLDINGS, INC.,**
a Delaware corporation


By: _____
        Name: Kefalari Mason
        Title: Authorized Officer


**EYP, INC.,**
a Massachusetts corporation


By: _____
        Name: Kefalari Mason
        Title: Authorized Officer


**EYP ARCHITECTURE & ENGINEERING, P.C.,**
a New York professional corporation


By: _____
        Name: Kefalari Mason
        Title: Authorized Officer

**EYP ARCHITECTURE & ENGINEERING OF CT, INC.,**
a Connecticut corporation

By: _____
          Name: Kefalari Mason
          Title: Authorized Officer

**EYP ARCHITECTURE & ENGINEERING OF NJ, INC.,**
a New Jersey corporation

By: _____
          Name: Kefalari Mason
          Title: _____

**EYPAE, INC.**,
a Massachusetts corporation

By: _____
          Name: Kefalari Mason
          Title: Authorized Officer

**WHR ARCHITECTURE, PC**,
a Texas professional corporation

By: _____
          Name: Kefalari Mason
          Title: Authorized Officer

**WHR DESIGN, P.C.**,
a Texas professional corporation

By: _____
          Name: Kefalari Mason
          Title: Authorized Officer

**IN WITNESS WHEREOF**, the undersigned have caused this IP Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

<u>**ASSIGNEE:**</u>

**PAGE SOUTHERLAND PAGE, INC.,**
**a Delaware corporation**


By: _____
       Name: Thomas McCarthy
       Title:   Chief Executive Officer

EXHIBIT 1

INTELLECTUAL PROPERTY RIGHTS

(i)     Registered Patents

        None

(ii)    Registered Trademarks / Service Marks

| EYP Architecture & Engineering, P.C. | | |
|---|---|---|
| Trademark | Application Number | Registration Number |
| EYP/ (and design) | 85497729 | 4186283 |
| TOTAL IMPACT DESIGN | 88248465 | 5826344 |
| PEOPLE, PURPOSE, PLANET | 88248475 | 5970553 |

| WHR Architects, Inc. | | |
|---|---|---|
| Trademark | Application Number | Registration Number |
| Architecture with people in mind | 77/469,951 | 3553580 |

(iii)   Domain Name Registrations:

                Eypae.com
                Sbs-architecture.com
                Stanleybeamansears.com
                Whrarchitects.com
                EYPGalery100.com
                Eypae.site
                Eypsquared.com

(iv)    Registered Copyrights:

| EYP Architecture & Engineering PC | |
|---|---|
| Copyright | Registration Number |
| Glenwood Sr. Housing Conceptual Design. | VAu001048302 |
| EYP Greenhouse Gas Assessment 2009-2010. | TX0007491439 |

| EYP, Inc. | |
|---|---|
| <u>Copyright</u> | <u>Registration Number</u> |
| Evaluating the Impact of STEM Buildings on College and University Campuses Volume 1: Methodology and Dimensions of Assessment 2011. | TXu001790882 |
| Evaluating the Impact of STEM Buildings on College and University Campuses Volume 2: Pilot Assessment - College of the Holy Cross 2011. | TXu001790837 |
| Evaluating the Impact of STEM Buildings on College and University Campuses Volume 3: Assessment - College of Holy Cross 2011. | TXu001790865 |
| Sustainability Roadmap. | TXu001812733 |

| WHR Architects, Inc. | |
|---|---|
| <u>Copyright</u> | <u>Registration Number</u> |
| WHR Architects Product Sustainability Label, et al. | VAu001040010 |

| Wedit Group, Inc. | |
|---|---|
| <u>Copyright</u> | <u>Registration Number</u> |
| Applewood Point Lyndale Green Cooperative & 7 other titles. | V9944D867 |

(v)    <u>Material Unregistered Trademarks:</u>

      None

**Exhibit D**
**(Form of Transition Services Agreement)**

## FORM OF TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (together with all exhibits, schedules and annexes hereto, this "Agreement") is dated as of June 30, 2022 (the "Effective Date"), by and between EYP GROUP HOLDINGS, INC., a Delaware corporation ("Group Holdings") and EYP, INC., a Massachusetts corporation ("EYP, Inc." and together with Group Holdings, "EYP"), on the one hand, and PAGE SOUTHERLAND PAGE, INC., a Delaware corporation, and its designee(s) listed on the signature pages hereto ("Page"), on the other hand.  Page together with EYP are collectively referred to as the "Parties" and each a "Party."

### RECITALS

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of June 20, 2022 (the "Purchase Agreement") by and among (i) Page ("Buyer"), (ii) EYP and its Subsidiaries and Affiliates listed on the signature pages thereto (each, a "Seller" and collectively, the "Sellers"), Sellers have agreed to sell, transfer, assign, convey and deliver to Buyer, and Buyer has agreed to purchase from Sellers, substantially all of the assets related to the Sellers' business of providing architectural and engineering design services, and associated consulting services, to public and private clients, including the existing Government Contracts and any Government Contracts awarded after the Closing (the "Acquired Business");

WHEREAS, this Agreement is made in furtherance of the terms of the Purchase Agreement, so that during the period when the Parties pursue the requisite novation of the Government Contracts to Page (or one of its designees), including pursuant to Federal Acquisition Regulation ("FAR") Subpart 42.12, up to such time that EYP Page (or one of its designees) and the relevant Governmental Entity as customer enter into one or more novation agreements and amendments with respect to all such Government Contracts, EYP shall perform all of its obligations under the Government Contracts in the Ordinary Course of Business, subject to the terms of this Agreement; and

WHEREAS, during the Transition Term, the Parties agree to provide, or cause to be provided, certain transition services to each other for certain specified agreed upon periods following the date of this Agreement and are willing to provide such transition services upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement, the Parties hereby agree as follows:

### ARTICLE I
### Definitions

SECTION 1.1   Defined Terms. Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.  As used in this Agreement, the following terms shall have the following meanings.

"Books and Records" means the books and records related to the Government Business.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in the City of New York are permitted or obligated by Law to be closed for regular banking business.

"Cleared Contract" means a prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, pricing agreement, letter contract, purchase order, task order or delivery order or other Contract or similar arrangement of any kind, and all amendments,

modifications or supplements thereto, between EYP or any of its Subsidiaries or Affiliates and (a) any Governmental Entity, (b) any prime contractor of a Governmental Entity in its capacity as a prime contractor or (c) any subcontractor with respect to any contract of a type described in clauses (a) or (b) above, in each case that requires a facility security clearance and/or industrial personnel security clearance for its performance; for the avoidance of doubt, the term "Cleared Contract" includes any agreement with a lower tier subcontractor or subconsultant engaged and utilized by EYP in its performance of the Cleared Contract.

"Cleared Government Business" means the Sellers' segment of the Government Business that services the Cleared Contracts.

"Cleared Personnel" means the Personnel possessing industrial personnel security clearances who are employed by EYP immediately prior to the Closing and as of the Closing employed by Page in accordance with the terms of the Purchase Agreement, which Personnel are listed on Schedule 1 hereto (which list may be amended during the Transition Term as agreed by the Parties in writing) and, in the event of any termination or resignation from Page's employ, any reasonable substitution as agreed by the Parties in writing (it being understood that email shall be sufficient to constitute "writing").  For the avoidance of doubt, the term "Cleared Personnel" includes EYP KMP Personnel.

"Cleared Premises" means real property premises under the control of EYP immediately prior to the Closing that are accredited as sensitive compartmented information facility.

"EYP KMP Personnel" means the EYP Personnel that constitute key management personnel remaining with EYP on a part-time basis after the Closing and during the Transition Term in connection with the performance of the Government Contracts.

"EYP Personnel" means the Personnel that are performing under the Government Contracts, including the Cleared Personnel and Noncleared Personnel.

"Government Business" means the Sellers' business of providing architectural and engineering design services to the Governmental Entity, which business constitutes the Acquired Business as specified in the Purchase Agreement; for the avoidance of doubt, this term shall include any ongoing business development efforts in connection with the Government Business.

"Government Contract" means (i) any Assumed Contract that requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) to permit the sale or transfer to Page (or one of its designees) of EYP's or any of its Subsidiaries' or Affiliates' rights under such Assumed Contract, and such Consent or Governmental Authorization has not been obtained prior to the Closing Date, as listed on Schedule 2 hereto, which for the avoidance of doubt include any existing Cleared Contract, and (ii) any Government Contract, including any Cleared Contract, awarded after the Closing.

"Noncleared Personnel" means EYP Personnel that perform under the Government Contracts that are not Cleared Contracts.

"Novation Request" means a request to be submitted to the responsible contracting officer or the appropriate Governmental Entity, including pursuant to FAR Subpart 42.12 and any other applicable rules, regulations or terms of the relevant Contracts Pending Novation, requesting that (i) Page (or one of its designees) be recognized as a successor in interest to EYP under the Non-Cleared Contracts Pending Novation and such Non-Cleared Contracts Pending Novation be novated to Page (or one of its designees), and (ii) Page be recognized as a successor in interest to EYP under the Cleared Contracts Pending Novation and such Cleared Contracts Pending Novation be novated to Page.

"Personnel" means, with respect to any Party, the employees, officers and directors employed by such Party.

"Provider" means the Party providing a Service.

"Provider Parties" means Provider and each of its Subsidiaries or Affiliates.

"Receipts" means the aggregate amount of cash receipts collected from the Customers under the Contracts Pending Novation during the applicable Remittance Period.

"Recipient" means the Party receiving a Service from the Provider.

"Recipient Parties" means Recipient and each of its Subsidiaries or Affiliates.

"Restricted Access Information" means information, in whatever form and however stored, that is classified, sensitive but unclassified or confidential, or controlled unclassified information, whether or not such information is expressly stated to be classified, sensitive but unclassified, confidential, controlled unclassified information or unclassified and pertaining to the contract, or specifically marked as such, and which EYP is prohibited from disclosing to Page (or one of its designees), or to any person or entity or for any public release or dissemination, by the terms of the applicable Contract and/or by applicable requirements and restrictions under NISPOM and/or the terms, conditions and restrictions under an applicable DD441 and DD441-1, DoD Security Agreement with EYP Inc. and DD254, Contract Security Classification Specification, except as provided by NISPOM or to the extent the information has been approved for public release by appropriate U.S. Government authority prior to its release.

"Schedules" means the Schedules to this Agreement.

"Third-Party Service Provider" means any third party that has been engaged by Provider or any of the Provider Parties to assist in the performance of Provider's obligations under this Agreement.  For the avoidance of doubt, the term "Third-Party Service Provider" shall include EYP's subconsultants performing under the Government Contracts from time to time.

SECTION 1.2   Section References.  The following capitalized terms, as used in this Agreement, have the respective meanings given to them in the Section of this Agreement as set forth below adjacent to such terms:

| Term | Section of this Agreement |
| --- | --- |
| "Acquired Business" | Recitals |
| "Additional Out-of-Pocket Expenses" | Section 5.1 |
| "Additional Representative" | Section 4.6(a) |
| "Agreement" | Recitals |
| "Buyer" | Recitals |
| "Cleared Contracts Pending Novation" | Section 2.5 |
| "Confidential Information" | Section 10.2 |
| "Contracts Pending Novation" | Section 2.5 |
| "Customer" / "Customers" | Section 2.3 |
| "Effective Date" | Preamble |
| "Estate Fiduciary" | Section 10.3 |
| "EYP" | Preamble |

| "FAR" | Recitals |
|---|---|
| "Fees" | Section 5.1 |
| "Force Majeure Event" | Section 7.1 |
| "Group Holdings" | Preamble |
| "Invoice" | Section 5.2 |
| "Invoice Due Date" | Section 5.2 |
| "Late Payment Rate" | Section 5.3 |
| "License" | Section 4.9 |
| "Losses" | Section 2.1(g) |
| "Netting Arrangement" | Section 2.2(b) |
| "Non-Cleared Contracts Pending Novation" | Section 2.4 |
| "Novation Period" | Section 2.1(a) |
| "Page" | Preamble |
| "Party"/"Parties" | Preamble |
| "Payments" | Section 2.1(f) |
| "Principal Representative" | Section 4.6(a) |
| "Purchase Agreement" | Recitals |
| "Remittance Date" | Section 2.2(b) |
| "Remittance Period" | Section 2.2(b) |
| "Representatives" | Section 4.6(a) |
| "Review Meetings" | Section 4.6(a) |
| "Seller"/"Sellers" | Recitals |
| "Services" | Section 4.1 |
| "Standard of Care" | Section 2.10 |
| "Sublease Agreement" | Section 4.9 |
| "Transfer Date" | Section 2.1(c) |
| "Transition Term" | Section 6.1 |

**ARTICLE II**
Government Contracts

SECTION 2.1    Performance Under Government Contracts.

(a)    Except as otherwise provided in this Agreement, EYP shall perform in the Ordinary Course of Business each of the Government Contracts in accordance with its respective terms, conditions and requirements from the Closing until the earlier of, and subject to Section 6.2: (i) the date on which such Government Contract is novated and transferred to Page (or one of its designees) including in accordance with FAR Subpart 42.12 and the terms of the Sale Order (or the remaining term of such Contract, if shorter) and (ii) the date that is six (6) months following the last day of the month in which the Closing occurs (the "Novation Period"); *provided, however*, that in the event there are any Government Contracts that have not been novated and transferred to Page (or one of its designees) pursuant to subsection (i) herein at the expiration of the time provided in subsection (ii) herein, the Parties, may elect to extend the Novation Period. In the Ordinary Course of Business and to the extent commercially reasonable, during the Novation Period, EYP:

(i)    shall maintain the Governmental Authorizations necessary to permit its continued performance under the Government Contracts during the Novation Period;

5

(ii)　　shall perform all requirements and furnish services and materials necessary to complete performance of the obligations of the Government Contracts in accordance with the terms and conditions set forth in such Government Contracts;

(iii)　　shall not intentionally take or authorize any action, and shall promptly cure any action or inaction, whether or not intentional, that would reasonably be expected to result in an early termination of a Government Contract;

(iv)　　shall notify Page of any new Government Contract executed with or awarded by a Customer; and

(v)　　shall fully and faithfully comply with the terms of this Agreement.

(b)　　In the Ordinary Course of Business and to the extent commercially reasonable, at no cost to EYP or its estate, Page (or one of its designees):

(i)　　during the Novation Period, shall at all times make (1) the Cleared Personnel employed by Page available to EYP to perform under the Government Contracts pursuant to a subconsulting agreement between EYP and Page on the terms to be agreed to by both Parties prior to Closing and (2) the Noncleared Personnel employed by Page (or one of its designees) available to EYP to perform under the Government Contracts as needed, to the extent necessary pursuant to a sub consulting agreement between EYP and Page (or one of its designees); in each case provided (*x*) the Cleared Personnel (except the EYP KMP Personnel) and Noncleared Personnel performing under the Government Contracts shall remain employees of Page (or one of its designees), in all respects; (*y*) neither Page nor any of its designees shall charge EYP for any work performed or any fees, expenses or charges incurred in connection with the performance of the Government Contracts by the Cleared Personnel and Noncleared Personnel, and (*z*) Page (or one of its designees), and subject to the terms of the Purchase Agreement, shall be responsible for, and shall pay any and all costs and expenses related to, the Cleared Personnel and Noncleared Personnel except as otherwise provided in Section 2.1(b)(ii), including without limitation, wages, commissions, bonuses, fees and other compensation, payroll taxes, employee benefits, insurance, unemployment insurance contributions, workers' compensation coverage, and any other employment liabilities related to the EYP Personnel's performance of the Government Contracts, including without limitation fees, costs, and expenses related to claims asserted by or on behalf of the EYP Personnel against EYP and/or Group Holdings (and their respective officers, directors, members, representatives, agents and employees) for matters first arising or occurring during the Novation Period, subject to the terms of Article VIII;

(ii)　　during the Transition Term, shall be responsible for, and shall pay any and all costs and expenses related to the employment of the EYP KMP Personnel by Page in accordance with the terms of employment of such EYP KMP Personnel, including without limitation, wages, commissions, bonuses, fees and other compensation, payroll taxes, employee benefits, insurance, unemployment insurance contributions, workers' compensation coverage, and any other employment liabilities related to the EYP KMP Personnel, to the extent such costs and expenses are incurred for services provided during the Transition Term; *provided, however*, that during the Transition Term, EYP shall pay directly to the EYP KMP Personnel fifty percent (50%) of their base salaries, less applicable withholdings, with Page paying the remaining fifty percent (50%) directly to the

EYP KMP Personnel, as well as all other costs and expenses related to the employment of the EYP KMP Personnel as described herein;

(iii)    during the Transition Term, shall permit full participation by EYP KMP Personnel in the employee benefit plans and programs available to its full-time employees, upon such terms as are applicable to its full-time employees, and shall take such actions as may be necessary to effectuate such full participation, which may include amending, or causing to be amended, such employee benefit plan documents and programs and/or reducing any minimum hours worked threshold required for participation in such plans or programs, in each case to comply with the terms hereof;

(iv)    during the Novation Period, shall, pursuant to Article IV herein, make available to EYP reasonable financial, administrative, human resources, legal, compliance and technical support necessary in the operation of the Government Business;

(v)    during the Transition Term, in addition to and in furtherance of its compliance with the restrictions set forth in Section 4.7, as of the Closing, Page, at each applicable level, shall adopt, including through a board resolution, and implement substantially the same security safeguards, restrictions, protocols and controls currently in place at EYP in connection with the Cleared Contracts and related classified information and access thereto, including with respect to the governance, brick-and-mortar and software security; and

(vi)    during the Transition Term, shall fully and faithfully comply with the terms of this Agreement.

(c)    Effective on the last day of the Novation Period, or such later date agreed to by the Parties in writing (the "Transfer Date"), Page shall offer, on the terms specified in Section 6.12 of the Purchase Agreement, to employ on a full time basis the EYP KMP Personnel who remain employed on a part-time basis by EYP as of the Transfer Date, all of whom shall be employed by Page on a part-time basis as of the Closing. EYP and Page shall take appropriate steps to effectuate an orderly transfer to Page of the employment of those EYP KMP Personnel who accept Page's offer of employment on the Transfer Date.

(d)    Each Party hereby agrees to comply with all Laws, Permits and Governmental Authorizations that are applicable to the performance of this Agreement and the Government Contracts except to the extent that such non-compliance shall not cause a Seller Material Adverse Effect.

(e)    Subject to the Netting Arrangement of Section 2.2 and except as provided in Section 2.1 and/or the Sale Order, by the execution and delivery of this Agreement, the Parties desire, intend and hereby agree to have EYP pass through to Page (or one of its designees) all of the financial burdens and benefits of the Government Contracts and any and all amendments, options, modifications and task, delivery or purchase orders thereunder and such other terms and conditions as may have been duly incorporated in the Government Contracts, subject to and in accordance with EYP's and Page's respective obligations under the Purchase Agreement.

(f)    Except as otherwise provided in the Sale Order, neither Page nor EYP shall charge a fee to the other Party with respect to the transactions and efforts contemplated by this Section 2.1. For avoidance of doubt, but subject to the Sale Order, the parties intend that Page (or one of its designees) shall be entitled to all payments due to EYP under the Government Contracts subject to the Netting Arrangement (the "Payments"), and the cost to the Customer shall not be increased by the arrangement contemplated in this Agreement.

SECTION 2.2    Invoicing; Payments; Netting Arrangement; Reporting.

(a)    During the Novation Period, EYP will invoice and bill all third parties and seek payments from Customers under or in connection with the Government Contracts in the Ordinary Course of Business and consistent with EYP's billing practices prior to Closing.

(b)    Every thirtieth (30th) calendar day (each, a "Remittance Period") following the Closing during the Novation Period and the thirty-day period thereafter (a "Remittance Date") (and if such Remittance Date is not a Business Day, then the next Business Day), EYP shall remit the Payments to Page, calculated as follows (referred to as "Netting Arrangement"): Receipts less: (i) any amounts paid by EYP to, or reserved for, the Third-Party Service Providers in connection with EYP's performance under the Government Contracts, (ii) a cash reserve amount, if any from time to time, with respect to any request for equitable adjustment, claims asserted by a Governmental Entity or any prime contractors, subcontractor, vendor or other third party arising under or relating to a Government Contract or any deposit or reserve requested by a Governmental Entity or any prime contractors, subcontractor, vendor or other third party with respect to any new Government Contract, (iii)  any amounts paid or payable by EYP to or on behalf of the EYP KMP Employees, (iv) any costs or expenses incurred as a result of EYP's performance under the Government Contracts, and (v) any costs or expenses incurred as a result of the novation and transferring of the Government Contracts to Page (or one of its designees), including any fees due to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 ("UST Fees") based on the disbursement of the Payments to Page (the "Novation Costs"). For the avoidance of doubt, the Receipts (y) shall not be used to satisfy any costs and expenses of the bankruptcy estate other than those described in subsections (i)-(v) herein, and (z) shall not be used to satisfy any of the costs and expenses incurred connection with the wind down of the Chapter 11 Cases, including but not limited to the costs and expenses related to the administration of the Chapter 11 Cases following the Closing, the confirmation of any plan of reorganization or liquidation, and UST Fees other than those identified in subsection (v) herein. Notwithstanding the foregoing, any amounts paid by EYP from EYP's cash (either from operating cash generated prior to the Closing Date, DIP proceeds or Sale proceeds) in connection with or under the Government Contracts will be offset against Receipts during the applicable Remittance Period.

(c)    All Receipts received by EYP shall, until used or applied as provided in subsection (b) herein, be segregated from all other funds, monies, and/or other assets of EYP and shall be held in trust for the benefit of Page. For the avoidance of doubt, EYP shall maintain a segregated account into which all Receipts shall be deposited, and shall not comingle the Receipts with any other assets.

(d)    On each Remittance Date, EYP shall provide to Page (or one of its designees), a cash receipts and disbursements report, as well as copies of any invoices related to the Novation Costs, supporting the applicable Payment.

SECTION 2.3    Contract Cancellation. If any one of the Government Contracts is terminated in whole or in part by a customer of a Government Contract (individually, a "Customer" and collectively, the "Customers") prior to expiration of the Novation Period, the rights of the parties concerning the termination will be governed by the provisions of the applicable termination clause (such as the termination for convenience provisions or the termination for default provisions, as applicable) set forth in such Government Contract. It is expressly understood, however, that (i) EYP shall have no right to terminate for its own convenience work under any Government Contract except to the extent the related Government Contract is terminated by the applicable Customer or as otherwise previously agreed in writing with Page, and (ii) EYP shall have no responsibility, liability or obligations to Page or any Person to the extent the related Government Contract is terminated by the Customer unless such termination is for cause resulting from EYP's material failure in its performance of professional services or any act or omission by EYP that resulted in a default under such terminated Government Contract, in which case Page may have a claim

against the estate in the amount not to exceed the percentage equivalent of the gross profit of such terminated Government Contract as related to the total gross profit of EYP and as applied to the Purchase Price allocated on account of the gross profit under such terminated Government Contract.

SECTION 2.4    Non-Cleared Government Contract Novations. Promptly following but in no event more than ten (10) Business Days after the Closing, EYP (in close cooperation with Page (or one of its designees)) will submit a Novation Request with respect to the Government Contracts listed on Schedule 2(a) hereto as requiring novation (collectively, the "Non-Cleared Contracts Pending Novation") in the form mutually acceptable to Page (or one of its designees) and EYP. Page hereby agrees to promptly supply any information or documentation that is necessary or as may be requested from time to time by the Governmental Entity in connection with the Novation Request related to the Non-Cleared Contracts Pending Novation, including the information required under FAR 42.1203-04 and FAR subpart 9.1.

SECTION 2.5    Cleared Government Contract Novations. Promptly following but in no event later than ten (10) Business Days following the Closing, EYP shall submit the Novation Request with respect to the Cleared Contracts listed on Schedule 2(b) hereto that require novation and any Cleared Contracts executed after the Closing (collectively, the "Cleared Contracts Pending Novation" and together with Non-Cleared Contracts Pending Novation, the "Contracts Pending Novation") in the form mutually acceptable to Page and EYP. Page hereby agrees to promptly supply any information or documentation that is necessary or as may be requested from time to time by the Governmental Entity in connection with any Novation Request related to the Cleared Contracts Pending Novation, including the information required under FAR 42.1203-04 and FAR subpart 9.1.

SECTION 2.6    Effect of Novation and Transfer of Government Contract. Upon the novation and modification of a Government Contract naming Page (or one of its designees) as the responsible contractor, such Government Contract shall immediately become an asset of Page (or one of its designees), and shall not be subject to the terms and conditions of this Agreement.

SECTION 2.7    Communications with Customers.

(a)    All communications, correspondence, invoices or other written submissions concerning the Government Contracts, including bids, requests for equitable adjustments, claims, contract modifications, and requests for final decisions, will be fully managed and prepared by EYP in the Ordinary Course of Business. Subject in all respects to the restrictions of access to Restricted Access Information related to the Government Business, material communications with the Governmental Entity regarding the Transactions shall be subject to the approval of Page as set forth in Section 6.10 of the Purchase Agreement, provided any such approvals will not be unreasonably withheld. For purposes of the foregoing sentence, material communications shall mean all communications regarding the economic and financial terms and obligations related to each Government Contract to the extent such communications involve, on a per-contract basis, aggregate consideration in excess of $250,000. Subject to the foregoing conditions and any restrictions on the transmission of Restricted Access Information, any such material communications received by a Party from the Customer or a third party shall be promptly forwarded to the other Party.

(b)    During the Novation Period, EYP will be responsible for preparing and certifying all claims, including all of EYP's direct, indirect and general and administrative cost claims, for each

9

Government Contract. During the Novation Period, EYP will submit such claims to the contracting officer and shall provide copies of each such claim to Page (or one of its designees).

SECTION 2.8    Separation of Books and Records; Delivery.

(a)    EYP shall use its commercially reasonable efforts to cause the Books and Records to be maintained separately from all other books and records and accounts related to the Acquired Business as promptly as practicable following the Closing (it being understood that the Books and Records may be maintained on the same server that the books and records and accounts of  Page (or one of its designees) are maintained on, subject to any and all EYP's existing security safeguards, restrictions, protocols and controls in place with respect to the Government Contracts and related Restricted Access Information and access thereto and any requirements and restrictions that the U.S. Government may require for and impose on EYP and/or Page (or one of its designees) concerning their books and records and dual use server as a condition of continuing to approve the EYP and Page facility security clearances under NISPOM, DD 254 and DD 441 and DD 441-1).

(b)    Following the novation of the Contracts Pending Novation, EYP shall transfer to Page (or one of its designees) control of all financial accounts and information maintained by EYP hereunder in connection with the Government Business, including the Books and Records.

SECTION 2.9    Standard of Care.  EYP shall perform, or shall cause to be performed, each of the Government Contracts consistent with the professional skill and care ordinarily provided by architects and engineers practicing in the same or similar locality under the same or similar circumstances and in substantially the same manner as EYP performed such Government Contracts in its ordinary course of business during the twelve-month period immediately prior to the Effective Date ("Standard of Care"). Page acknowledges that, in connection with performing under the Government Contracts hereunder, EYP shall have no obligation to change or to cause to be changed any practices or processes used by it prior to the Effective Date.  Nothing in this Agreement shall require EYP to take or refrain from taking or cause to be taken or refrained from taking any action that in EYP's reasonable judgment could reasonably be expected to result in any breach or violation of any Law or any Government Contract.

**ARTICLE III**
Other Transition Services Provided by EYP

SECTION 3.1    Architecture and Engineering Licenses.  In coordination with Page, EYP may use its commercially reasonable efforts to (i) form the new entities that substantially mirror the corporate and governance structure of EYP as of the Effective Date (collectively, "NewCos") and (ii) through NewCos, apply to the applicable Governmental Entities for the architecture and/or engineering licenses that are necessary to ensure the continued performance under the Assumed Contracts ("A&E Licenses").  Page hereby acknowledges that consideration and issuance of any A&E License is subject to the applicable Governmental Entity's discretion and control and that EYP shall have no Liability whatsoever for not procuring any of the A&E Licenses prior to the expiration of the Transition Term.  Any equity held by EYP in NewCos shall be transferred to Page (or one of its designees), and the management agreement, if any, entered into between a NewCo and EYP will be assumed and assigned by EYP to Page (or one of its designees) in each case subject to the Bankruptcy Court's approval. To the extent, any A&E License is not procured by the expiration of the Transition Term, the Parties may extend the Transition Term with respect to any Government Contract or Assumed Contract performance under which is subject to any such A&E License until such A&E License is procured.

SECTION 3.2    Assumed Insurance Policies.  As soon as reasonably practicable, with respect to each of the Assumed Insurance Policies, subject to consent and discretion of each insurance

provider, EYP and Page shall use commercially reasonable effort to add Page (or one of its designees) as an "additional insurer" under each of the Assumed Insurance Policies or otherwise effectuate the assignment of the Assumed Insurance Policies to Page (or one of its designees) in accordance with the Purchase Agreement. All associated costs and expenses, including any additional premium shall be deemed Additional Out-of-Pocket Expenses and shall be borne by Page in accordance with Article V.

**ARTICLE IV**
Transition Services to be Provided by Page

SECTION 4.1    Transition Services. Upon the terms and subject to the conditions set forth in this Agreement, Page agrees to provide, or to cause to be provided, to EYP the services necessary to support the operation of the Government Business during the Novation Period as set forth in Article II and this Article IV (collectively, the "Services").  Page agrees to reasonably cooperate with EYP related to each Service in connection with the Parties' transition and migration plan for the Government Contracts as set forth in Article II herein.

SECTION 4.2    Scope of Services.  Notwithstanding anything to the contrary contained herein but as qualified by Article II, (a) Page shall only be required to perform or cause to be performed the Services to the extent such Services are necessary to allow EYP to satisfy its obligations under the Government Contracts, and (b) except as provided in Section 4.4, the Services to be provided by Page or caused to be provided by Page under this Agreement are furnished on an "as is" condition and on a "where is" basis, and without representation, warranty or condition of any kind, express or implied, including any warranty or condition of non-infringement, merchantability or fitness for any particular purpose.

SECTION 4.3    Personnel; Third-Party Service Providers.  Except as provided in Article II, (a) the selection of the Personnel who will provide the Services for and on behalf of Page shall be made by Page in its reasonable sole discretion and (b) in no event shall Page be required to hire or engage additional Personnel or to retain any specific Personnel to provide the Services (provided that the foregoing shall not limit Page's obligations to provide the Services pursuant to the terms hereof).  For the avoidance of doubt, Page shall not make any engagement determination with respect to the Third-Party Service Providers that are performing services under any Contract Pending Novation until such Contract Pending Novation is novated to Page.  EYP understands that prior to the Effective Date, Page may have contracted with Third-Party Service Providers to provide services in connection with all or any portion of the Services to be provided hereunder.  Page reserves the right to continue, in accordance with past practice prior to the Effective Date, to subcontract with Third-Party Service Providers to provide the Services.  EYP acknowledges that any interruption or suspension in the provision of any services by a Third-Party Service Provider generally to Page shall likely cause the provision of such Services under this Agreement to be so interrupted or suspended, as the case may be.  In the event there is an interruption or suspension in the Services being provided by any Third-Party Service Provider to Page (which such interruption or suspension adversely impacts the Services being provided by such Third-Party Service Provider to EYP hereunder), Page agrees that (x) with respect to any action taken by Page in response to such interruption or suspension, it shall take such action on behalf of and for the benefit of EYP as well as itself and (y) if any Contract with a Third-Party Service Provider expires or is otherwise terminated and such expiration or termination adversely impacts the Services being provided to EYP, to the extent Page arranges replacement services with respect thereto, such replacement services shall, unless otherwise requested by EYP, also cover the Services that were being provided by such Third-Party Service Provider to EYP hereunder; provided that EYP shall be responsible for its *pro rata* share of any additional fees, expenses or other costs paid by Page to a third party for such replacement services that are provided to EYP, which fees, expenses and costs shall be deemed Additional Out-of-Pocket Expenses solely for purposes of the Invoice contemplated by Section 5.2; provided further that Page shall provide reasonable notice of all such charges contemplated in this Section 4.4.3 and EYP shall consent to all such charges (consent to not unreasonably

be withheld); provided further, however, that, to the extent that such replacement services require such additional charges, Page shall not be required to provide such replacement services until such time, if any, that EYP has consented to such additional charges.

SECTION 4.4    Standard of Performance; Standard of Care.  Subject to Sections 4.3, 4.5 and 4.6(a), Page shall perform or shall cause to be performed the Services at a level of quality and in a manner generally consistent with how such Services were performed over the 12-month period prior to the Closing.  Except as agreed in Article II, in furtherance of the foregoing, EYP acknowledges that, in connection with performing the Services hereunder, Page shall have no obligation to change or to cause to be changed any practices or processes used by it prior to the Effective Date in performing the Services. Nothing in this Agreement shall require Page to take or refrain from taking any action that in Page's reasonable judgment could reasonably be expected to result in any breach or violation of any Law or, subject to Section 4.5, any Contract to which Page is a party.

SECTION 4.5    Transitional Nature of Services; Changes.  Each Party acknowledges the transitional nature of the Services. Each Party may make or cause to be made changes from time to time in the manner of performing the Services (a) if it has made similar changes in performing similar services for itself and its Subsidiaries and Affiliates or (b) if the Parties previously agreed in writing (it being understood that email is sufficient); provided that notwithstanding the making of any such changes, each Party shall continue to remain responsible for the performance of the Services in accordance with this Agreement.

SECTION 4.6    Cooperation

(a)    Each Party agrees that it shall appoint (i) a principal representative (each, a "Principal Representative") to act as the principal contact person with respect to all issues relating to the provision of the Services pursuant to this Agreement and (ii) representatives (each, an "Additional Representative" and, together with the Principal Representatives, the "Representatives") to act as additional contact persons with respect to issues relating to the provision of the Services. The Representatives shall hold review meetings by telephone or in person as mutually agreed upon by the Parties to discuss any matters under this Agreement ("Review Meetings").  In the Review Meetings, the Representatives shall be responsible for discussing any problems identified with the provision of the Services and, to the extent any changes in the provision of the Services are agreed upon, the implementation of such changes.  This Section 4.6(a) is subject to any and all security safeguards, restrictions, protocols and controls currently in place at EYP in connection with the Government Contracts and related Restricted Access Information and access thereto.

(b)    In the event that (i) there is nonperformance of any Service as a result of a Force Majeure Event or (ii) the provision of a Service would violate any Law, Permit, Governmental Authorization or any agreement to which the Provider is a party, the Parties shall work together in good faith to arrange for an alternative means by which the Services so affected may be obtained; provided that other Party shall reimburse the Provider for all reasonable and documented costs and expenses incurred by the Provider in connection therewith, subject to the Netting Arrangement of Section 2.2 to the extent applicable.

(c)    Each Party may, effective upon written notice to the other Party, change its Principal Representative or any Additional Representative at any time.

SECTION 4.7    Systems and Premises; Policies and Procedures.

(a)    Subject in all respects to Section 4.7(c), if, in connection with this Agreement, any Party's Personnel are given access, whether on-site or through remote facilities, to any of the other Party's

computer or electronic data storage systems, such Party shall use commercially reasonable efforts to ensure that such Party's Personnel shall limit such access and use solely to the extent related to the Services and will not attempt to access any computer system, electronic file, software or other electronic services other than those specifically related to the Services.  Each Party shall (and shall use commercially reasonable efforts to ensure that such Party's Personnel shall) comply with all of the other Party's policies and procedures for the use of the other Party's electronic resources (to the extent made available to such Party).

(b)    Subject in all respects to Section 4.7(c) while performing work on the other Party's premises or when accessing the other Party's information technology systems and networks, each Party shall, and shall use commercially reasonable efforts to ensure that such Party's Personnel shall, comply with the other Party's applicable premises, physical security and network security policies that the other Party has made available to such Party.

(c)    Page and its Personnel, in their capacity for and on behalf of Page (or one of its designees) (a) shall comply with any and all security safeguards, restrictions, protocols and controls currently in place at EYP in connection with the Government Contracts and related Restricted Access Information and access thereto and (b) shall not access or grant access to any third party, shall not seek or require access to and shall be formally excluded from (i) any information in EYP's possession, custody or designated by EYP as Restricted Access Information and (ii) the Cleared Premises.  For the avoidance of doubt, the Cleared Personnel performing under the Government Contracts for and on behalf of EYP shall not be subject to the restrictions set forth this Section 4.7(c)

SECTION 4.8    Intellectual Property.

(a)    License. Subject to the terms of this Agreement and the Purchase Agreement, Page grants to EYP a nontransferable, nonexclusive, non-sublicensable license to use the Transferred Intellectual Property for use by EYP in its performance of Services in accordance with Article II and during the term of this Agreement. The term of this license shall be coextensive with the term of this Agreement. Such use shall be in accordance with EYP's past practices over the 12-month period prior to the Closing.

(b)    Ownership. Except as expressly set forth in this Agreement or the Purchase Agreement, neither Party shall acquire under this Agreement any right, title or interest in any property or asset that is owned or licensed by the other Party (including any intellectual property rights). Any intellectual property rights owned or licensed by one Party or any of its Affiliates that is provided to the other Party or any of such other Party's Affiliates or third-party providers or third-party vendors pursuant to this Agreement shall remain the property of the Party providing such intellectual property rights, or the Affiliate of such Party that provides same.

SECTION 4.9    Subleased Premises.  Subject to the terms of the Sale Order, the Parties will enter into that certain Sublease Agreement, attached hereto as **Annex 1** (the "Sublease Agreement").

SECTION 4.10 Wind Down Services. After the Closing, Page shall provide reasonable access to information and materials and shall otherwise reasonably and in good faith cooperate with the Estate Fiduciary to wind down the estates of EYP and its Subsidiaries and Affiliates, with any reasonable and documented out-of-pocket expenses incurred by Page, as the case might be, to be borne by the estates.

### ARTICLE V
### Fees for Services

SECTION 5.1    Fees.  Except as otherwise stated in, and subject to, Article II and Sections 3.2, 4.6(b) and 4.10, in addition to any consideration paid or payable under the Purchase Agreement, the

Parties agree that neither Page nor EYP shall charge a fee to the other Party with respect to the Services. Amounts payable pursuant to Sections 3.2, 4.6(b) and 4.10 shall constitute "Additional Out-of-Pocket Expenses."

SECTION 5.2  Billing Procedure.  The Additional Out-of-Pocket Expenses shall be invoiced (an "Invoice") monthly by Provider or one of the other Provider Parties. Invoices shall be delivered no later than the fifteenth (15th) calendar day of each month for the Additional Out-of-Pocket Expenses incurred during the immediately preceding month.  All Invoices shall be payable by Recipient no later than the thirtieth (30th) calendar day of each month (the date on which a payment is due, the "Invoice Due Date").

SECTION 5.3  Late Payments.  Any Additional Out-of-Pocket Expenses not paid within thirty (30) days after the Invoice Due Date shall bear interest at a rate of 6.0% per annum (the "Late Payment Rate") from the Invoice Due Date until the date payment is received in full by Provider, as applicable; provided that if Recipient has disputed in good faith any amount of any Additional Out-of-Pocket Expense and it has been finally determined that Recipient is not obligated to pay such disputed amount, then Recipient shall not be obligated to pay interest at the Late Payment Rate on such disputed amount.

SECTION 5.4  Taxes.  Subject to Section 2.2, the amount of any actual and documented sales tax, value added tax, use tax, rent tax, goods and services tax or similar tax (excluding taxes on Provider's income or ownership of property) that is required to be paid by Provider or any of the other Provider Parties in connection with the Services provided hereunder shall be promptly reimbursed by Recipient. Such reimbursement shall be promptly made after Recipient has received a copy of such actual and documented taxes.

## ARTICLE VI
### Term and Termination

SECTION 6.1  Agreement Term.  The term of this Agreement shall commence on the Closing Date and, subject to Section 6.2, shall continue in effect until (the "Transition Term") the earlier of (a) the fifth (5th) Business Day following the termination of the Novation Period and (b) the Transfer Date.

SECTION 6.2  Termination Due to Nonpayment.  This Agreement, or the obligation to provide any Service hereunder, may be terminated at any time if a Party fails to pay any amount payable by such Party as required under this Agreement or the Purchase Agreement and such failure continues for a period of ten (10) Business Days following the date on which such amount was due and payable and such Party does not dispute such payment obligation in good faith; provided that the Party has been provided written notice of the other Party's intent to terminate this Agreement, or any Service hereunder, at least ten (10) days prior to such termination.

SECTION 6.3  Sums Due.  Upon the termination of this Agreement, or upon the termination of all Services provided hereunder, Page shall be entitled to prompt payment or reimbursement of, and EYP shall promptly pay and reimburse Page, all amounts accrued (whether or not invoiced) or due, as of the date of such termination.

SECTION 6.4  Survival.  The provisions of Articles VI, VIII, and X shall survive any termination of this Agreement.

**ARTICLE VII**
Force Majeure

SECTION 7.1  <u>Force Majeure</u>.  In the event that performance of any Service is interrupted, or performance of any terms or provisions of this Agreement (except for the payment of any amounts payable hereunder) is delayed or prevented, in whole or in part, because of or related to compliance with any Order or Law, or because of riots, war, public disturbance, strike, labor dispute, fire, explosion, storm, flood, earthquake, acts of God, acts of nature, including outbreaks of illness or health emergencies (including the COVID-19 pandemic, and business, travel, shelter-in-place laws, and other restrictions related thereto), acts of terrorism, unavailability of supplies, major breakdown or failure of transportation, manufacturing, distribution or storage facilities, or for any other reason which is not within the control of the Party whose performance is interfered with and which by the exercise of reasonable diligence such Party is unable to prevent (each, a "<u>Force Majeure Event</u>"), then upon prompt written notice to the other Party providing reasonable detail as to the nature of such Force Majeure Event, subject to the obligations under <u>Section 4.6(b)</u> hereof, the Party affected by such Force Majeure Event shall be excused from its obligations hereunder so long as such Force Majeure Event continues, and no liability shall attach against either Party on account thereof.  No Party shall be excused from performance if such Party fails to use reasonable diligence to mitigate the effects of the Force Majeure Event.

**ARTICLE VIII**
Indemnification

SECTION 8.1  <u>Indemnification by Page</u>.

(a)  Subject to <u>Section 8.1(c)</u> below, in the event that any Governmental Entity initiates any investigation or enforcement action against EYP (and/or its officers, directors, members, representatives, agents and employees) solely in relation to matters occurring during the Novation Period with respect to the Contracts Pending Novation, then Page shall, to the maximum extent permitted by law, indemnify EYP (and its respective officers, directors, members, representatives, agents and employees) against and hold them harmless from any loss, liability, damage, cost or expense (including reasonable fees and expenses of counsel) not otherwise covered by applicable insurance (collectively, "<u>Losses</u>") incurred by any such indemnified person in connection with such claim, action, investigation and/or enforcement action. The procedures set forth in <u>Section 8.3</u> shall apply to this section.

(b)  Page shall indemnify EYP and the EYP KMP Personnel against and hold them harmless from any Losses incurred by any such indemnified person in connection with the performance of Services by Page under this Agreement to the extent resulting from the gross negligence or willful misconduct of Page or its Personnel, as determined by a court of competent jurisdiction in a final and nonappealable judgment.

(c)  Page shall have no obligation under this Agreement to defend or indemnify EYP, its officers, directors, members, representatives, agents, or employees, or the EYP KMP Personnel (collectively, the "<u>EYP Indemnified Parties</u>"), from any Losses resulting from either (i) the gross negligence or willful misconduct of EYP;  (ii) a violation by EYP of any Law or Contracts Pending Novation in violation of the Standard of Care, in each case as determined by a court of competent jurisdiction in a final and nonappealable judgment.  In addition, Page shall have no obligation to defend or indemnify any EYP Indemnified Party with respect to any Excluded Liability.

SECTION 8.2  <u>Indemnification by EYP</u>.  EYP shall indemnify Page (or one of its designees),  and each of their respective officers, directors, members, representatives and employees against and hold them harmless from any Losses incurred by any such indemnified person in connection with the

performance of Services by EYP or the EYP KMP Personnel under this Agreement to the extent resulting from the gross negligence or willful misconduct of EYP or the EYP KMP Personnel, as determined by a court of competent jurisdiction in a final and nonappealable judgment.

SECTION 8.3    Procedures Relating to Indemnification.    Each Party and any other indemnified persons shall be entitled to the indemnity described in this Article VIII, provided that, in the case of third-party claims, the following conditions are met.

(a)    Promptly upon learning of any claim for which indemnification is sought from the indemnifying party, the indemnified party shall notify the indemnifying party of such claim and shall furnish to the indemnifying party all information known and reasonably available to the indemnified party related to such claim; provided that any failure to comply with the provisions of this clause (a) shall not relieve the indemnifying party of its indemnification obligations except to the extent such failure shall have adversely prejudiced the indemnifying party.

(b)    In the event of the commencement of litigation on the basis of such claim, the indemnified party shall tender the defense of such litigation to the indemnifying party, and the indemnifying party shall promptly assume and thereafter diligently prosecute the defense of such claim, and the indemnifying party shall bear all Losses in connection therewith, using counsel selected by the indemnifying party (which shall be subject to the indemnified party's approval, which shall not be unreasonably withheld, conditioned or delayed).  The indemnified party shall be entitled to engage separate counsel and participate in such defense; provided that the fees and expenses and such separate counsel shall be paid by the indemnified party unless the interests of the indemnified party and the indemnifying party are in conflict so that they cannot be adequately represented by the same counsel, in which event the reasonable fees and expenses of such separate counsel shall be paid by the indemnifying party following a final determination of the indemnification liabilities hereunder.

(c)    Neither the indemnifying party nor the indemnified party shall settle any such claim without the prior written consent of the other party, which consent may be withheld in the other party's sole discretion if such settlement would require the expenditure of funds by the other party or admission on behalf of, or otherwise attribute to, the other party any fault or misconduct.  To the extent that both the indemnified party and the indemnifying party are required to bear damages, claims, costs and expenses with respect to a particular claim, the intent of the parties is that the indemnified party and the indemnifying party shall bear such damages, claims, costs and expenses in proportion to their respective degrees of responsibility for such claim as allocated in this Article VIII or, if not allocated herein, then in accordance with their respective percentages of fault or responsibility for such claims.

SECTION 8.4    Liability.    Except as otherwise specifically provided in this Agreement (and excluding the Fees, Additional Out-of-Pocket Expenses, and any other amounts payable hereunder or under the Purchase Agreement), each Party acknowledges that its sole and exclusive monetary remedy with respect to any claims arising under this Agreement shall be pursuant to the indemnification provisions set forth in this Article VIII.  In furtherance of the foregoing, each Party hereby waives, or agrees to cause to be waived, from and after the Closing, any and all rights, claims and causes of action it may otherwise have against the other Party arising under or based upon statutory or common law or otherwise (including any rights of contribution or recovery under the Comprehensive Environmental Response, Compensation, and Liability Act or similar environmental Law) to the extent arising under this Agreement.  To the maximum extent permitted by applicable Law, except with respect to third-party claims subject to indemnification hereunder, in no event shall any Loss for which indemnification is provided under this Article VIII include consequential, lost profits, special, punitive, incidental or indirect damages.

SECTION 8.5  <u>Specific Performance</u>.  The Parties agree that irreparable damage for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  In furtherance of the foregoing, the Parties acknowledge and agree that (a) the Parties shall be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.11</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and without that right, neither Party would have entered into this Agreement.  The Parties agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the Parties otherwise have an adequate remedy at law.  The Parties acknowledge and agree that any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 8.5</u> shall not be required to provide any bond or other security in connection with any such order or injunction.

**ARTICLE IX**
<u>Access; Records</u>

SECTION 9.1   <u>Access</u>.  Subject in all respects to the restrictions of access to Restricted Access Information related to the Government Business, Recipient shall, and shall cause the other Recipient Parties to, (i) make available on a timely basis to Provider and the other Provider Parties such information and materials reasonably requested by Provider or any of the Provider Parties to enable Provider or any of the Provider Parties to provide the Services and (ii) provide to Provider and the other Provider Parties reasonable access to the premises of Recipient and the other Recipient Parties (including the systems, software and networks located therein), to the extent necessary to permit Provider or any of the other Provider Parties to provide the Services.

SECTION 9.2   <u>Regulatory Audit</u>.  In connection with any investigation or review of EYP by any Government Entity, (a) Page shall timely respond and reasonably cooperate therewith and (b) in the event any Governmental Entity shall request from Page any access, information or assistance, Page shall reasonably cooperate therewith.  In the event that, in connection with any investigation or review of Page, any governmental entity shall request from EYP any access, information or assistance, EYP shall reasonably cooperate therewith.

SECTION 9.3   <u>Delivery of Books and Records</u>.  Within five (5) Business Days after the expiration of the Transition Term, EYP shall transfer to Page control of all financial accounts and information maintained by EYP hereunder in connection with the Services.

**ARTICLE X**
<u>Miscellaneous</u>

SECTION 10.1   <u>Intentionally Omitted.</u>

SECTION 10.2   <u>Confidentiality</u>.  Either Party may provide to the other Party certain confidential, proprietary and trade secret business and technical information in connection with the performance of this Agreement ("<u>Confidential Information</u>").  All information shall be presumed to be Confidential Information unless such information is generally available to the public (other than by the receiving party in violation of this <u>Section 10.2</u>) or if a disclosing party acknowledges in writing that such information is not Confidential Information.   Each Party shall preserve the confidentiality of all

Confidential Information that is provided by the other Party in connection with this Agreement, and shall not, without the prior written consent of the other Party, disclose, display or make available to any person, or use for its own or any other person's benefit, other than as necessary in performance of its obligations under this Agreement, any Confidential Information of the other Party; provided that a Party may disclose such portion of the Confidential Information relating to the other Party to the extent, but only to the extent, that the disclosing party reasonably believes that such disclosure is required in connection with litigation between the Parties hereto relating directly to this Agreement (including in the Bankruptcy Case), under applicable Law, pursuant to any Order or as a consequence of the rules of a securities exchange; provided further that the disclosing party first notifies the other Party hereto of such requirement and allows such Party a reasonable opportunity to seek a protective order or other appropriate remedy to prevent such disclosure if permitted by applicable Law.  The Parties shall exercise a commercially reasonable standard of care to safeguard all Confidential Information of the other Party against improper disclosure or use.  The Parties acknowledge that money damages would not be a sufficient remedy for any breach of the provisions of this Section 10.2 and that the non-breaching party shall be entitled to equitable relief in a court of law in the event of, or to prevent, a breach or threatened breach of this Section 10.2.

SECTION 10.3    Assignment; Estate Fiduciary.  Neither this Agreement nor any rights or obligations hereunder may be assigned or otherwise transferred by any Party (including by operation of law) without the prior written consent of the other Party, and any assignment or transfer without such consent shall be null and void and of no effect.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any liquidating trustee, administrator or other fiduciary appointed in the Chapter 11 Cases (other than a trustee appointed pursuant to 11 U.S.C. § 1104 or upon the conversation of the Chapter 11 Cases to a case(s) under chapter 7 of the Bankruptcy Code), including any liquidating trustee, administrator or other fiduciary appointed pursuant to a chapter 11 plan confirmed in the Chapter 11 Cases (the "Estate Fiduciary").  The Parties agree that the Estate Fiduciary shall be mutually acceptable to Page and EYP.

SECTION 10.4    No Third-Party Beneficiaries.  Except as provided in Article VIII, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any person (including any creditor of a Party), other than the Parties and such permitted assigns, any legal or equitable rights hereunder, whether as third-party beneficiaries or otherwise.

SECTION 10.5    Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by each Party.

SECTION 10.6    Waivers.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder.  No provision or term of this Agreement may be waived except pursuant to a writing executed by the waiving Party.

SECTION 10.7    Notices.  Any notice, instruction, direction or demand under the terms of this Agreement required to be in writing shall be duly given upon delivery, if delivered by hand, electronic mail transmission or mail to the chief executive office of the other Party (attention: CEO), with a copy to the Principal Representative of the other Party, or to such other addresses, telecopy number or e-mail address and with such other copies, as such Party may hereafter specify for the purpose by notice to the other Party.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business

Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.  Each such notice, request or other communication shall be effective (a) if given by telecopy, when such telecopy is transmitted to the e-mail address specified to the other Party and evidence of receipt is received or (b) if given by any other means, upon delivery or refusal of delivery at the address specified in this <u>Section 10.7</u>.  The initial notice information for each party is as follows.

(a)     If to Page, to:

        Page Southerland Page, Inc.
        1615 M Street, NW Suite 700
        Washington, DC 20036
        Attention:     Thomas McCarthy
        Email:         tmccarthy@pagethink.com

with copies (which shall not constitute notice) to Page's Principal Representative at:

        Chamberlain, Hrdlicka, White, Williams & Aughtry P.C.
        1200 Smith Street, Suite 1400
        Houston, TX 77079
        Attention:     Jarrod Martin
                    Habeeb I. Gnaim
        Email:         jarrod.martin@chamberlainlaw.com
                    h.gnaim@chamberlainlaw.com

(b)     if to EYP, to:

        EYP, Inc.
        201 Fuller Road, 5th Floor
        Albany, New York 12203
        Attention:     Kefalari L. Mason
        Email:         kmason@eypae.com

with copies (which shall not constitute notice) to EYP's Principal Representative at:

        DLA Piper LLP (US)
        444 West Lake Street
        Chicago, Illinois 60606
        Attention:     Richard A. Chesley
        Email:         richard.chesley@us.dlapiper.com

     SECTION 10.8   <u>Interpretation</u>.  When a reference is made in this Agreement to an Article, a Section, Exhibit or Schedule, such reference shall be to an Article of, a Section of, an Exhibit to or Schedule to, this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "date hereof" when used in this Agreement shall refer to the date of this Agreement.  The terms "or", "any" and "either" are not exclusive.  The word "extent" in

the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". The word "will" shall be construed to have the same meaning and effect as the word "shall". All accounting terms used and not defined herein shall have the respective meanings given to them under United States generally accepted accounting principles as in effect from time to time. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Unless otherwise specifically indicated, all references to "dollars" or "$" shall refer to the lawful money of the United States. References to a person are also to its permitted assigns and successors. The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

SECTION 10.9    Counterparts.    This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party.

SECTION 10.10    Severability.  If any term, condition or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, provisions and conditions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable Law.

SECTION 10.11    Governing Law/Jurisdiction.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts executed in and to be performed entirely within that State, regardless of the laws that might otherwise govern under any applicable conflict of laws principles.

(b)    Each Party to this Agreement, by its execution hereof, (a) hereby irrevocably submits, and agrees to cause each of its Affiliates to submit, for the purpose of any proceeding arising out of or based upon this Agreement or relating to the subject matter hereof (the "Proceeding"), to the exclusive jurisdiction of (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) in the event the Bankruptcy Case is closed or dismissed, or if the Bankruptcy Court is unwilling or unable to hear such Proceeding, in the United States District Court for the District of Delaware or if that court does not have subject matter jurisdiction, in any state court located in the City of Wilmington and County of New Castle, Delaware (and, in each case, any appellate court thereof), (b) hereby waives, and agrees to cause each of its Affiliates to waive, to the extent not prohibited by applicable Law, and agrees not to assert, and agrees not to allow any of its Affiliates to assert, by way of motion, as a defense or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the above named courts, that its property is exempt or immune from attachment or execution, that any such Proceeding brought in one of the above named courts is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such courts and (c) hereby agrees not to commence or to permit

any of its Affiliates to commence any Proceeding arising out of or based upon this Agreement or relating to the subject matter hereof other than before one of the above named courts or to make any motion or take any other action seeking or intending to cause the transfer or removal of any such Proceeding to any court other than one of the above named courts whether on the grounds of inconvenient forum or otherwise.  The Parties irrevocably agree that venue would be proper in any of the above courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Proceeding.  Each Party hereto hereby consents to service of process in any such Proceeding in any manner permitted by Delaware Law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 10.7</u> is reasonably calculated to give actual notice.

SECTION 10.12    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS <u>Section 10.12</u>.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

**<u>BUYER</u>**:

**PAGE SOUTHERLAND PAGE, INC.**

By: _____

        Name: Thomas McCarthy
        Title:   Chief Executive Officer

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

<u>**SELLER:**</u>

**EYP GROUP HOLDINGS, INC.,**
a Delaware corporation


By: _____
      Name: Kefalari Mason
      Title: Authorized Officer


**EYP HOLDINGS, INC.,**
a Delaware corporation


By: _____
      Name: Kefalari Mason
      Title: Authorized Officer


**EYP, INC.,**
a Massachusetts corporation


By:_____
      Name: Kefalari Mason
      Title: Authorized Officer


**EYP ARCHITECTURE & ENGINEERING, P.C.,**
a New York professional corporation


By: _____
      Name: Kefalari Mason
      Title: Authorized Officer


*[SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT]*

**EYP ARCHITECTURE & ENGINEERING OF CT, INC.,**
a Connecticut corporation


By: _____
　　　Name: Kefalari Mason
　　　Title: Authorized Officer


**EYP ARCHITECTURE & ENGINEERING OF NJ, INC.,**
a New Jersey corporation


By: _____
　　　Name: Kefalari Mason
　　　Title: Authorized Officer


**EYPAE, INC**., 
a Massachusetts corporation


By: _____
　　　Name: Kefalari Mason
　　　Title: Authorized Officer


**WHR ARCHITECTURE, PC**,
a Texas professional corporation


By: _____
　　　Name: Kefalari Mason
　　　Title: Authorized Officer


**WHR DESIGN, P.C.**,
a Texas professional corporation


By: _____
　　　Name: Kefalari Mason
　　　Title: Authorized Officer


*[SIGNATURE PAGE TO TRANSITION SERVICES AGREEMENT]*

ANNEX 1 – FORM OF SUBLEASE

## **SUBLEASE**

THIS SUBLEASE, dated the __ day of _____, 2022 (the "<u>Effective Date</u>"), between Page Southerland Page, Inc., a Delaware corporation ("<u>Sublessor</u>"), and EYP, Inc. a Massachusetts corporation ("<u>Subtenant</u>").

## **W I T N E S S E T H :**

1.  <u>DEMISE AND TERM</u>.  Sublessor hereby leases to Subtenant, and Subtenant hereby hires from Sublessor, those certain premises (the "<u>Subleased Premises</u>") located on the __ floor of the building known as [_____  _____] containing approximately _____square feet as shown on <u>Schedule A</u> attached hereto and made a part hereof and being a portion of the premises which were leased to Sublessor under the Main Lease (hereinafter defined).  The term of this Sublease shall be the period commencing on the Effective Date and continuing until the date that is the last calendar day immediately preceding the one-year anniversary of the Effective Date (the "<u>Termination Date</u>"). Notwithstanding the foregoing, after the conclusion of the Transition Term (as defined in that certain Transition Services Agreement dated as of [_____], 2022, by and among EYP, Inc., Page, and certain other parties signatory thereto (the "<u>Transition Services Agreement</u>")), Sublessor shall have the right, in its sole discretion, to terminate this Sublease at any time prior to the Termination Date upon thirty (30) days' prior written notice thereof to Subtenant.

2.  <u>SUBORDINATE TO MAIN LEASE</u>.  This Sublease is and shall be subject and subordinate in all respects to the lease dated [_____] (the "<u>Main Lease</u>") between [_____] ("<u>Overlandlor</u>d"), as landlord, and [_____], as tenant, which Main Lease was assumed and assigned to Sublessor pursuant to the Sale Order (as defined in the Transition Services Agreement ).

3.  <u>INCORPORATION BY REFERENCE</u>.  The terms, covenants and conditions of the Main Lease are incorporated herein by reference so that, except to the extent that they are inapplicable or are modified by the provisions of this Sublease, for the purpose of incorporation by reference each and every term, covenant and condition of the Main Lease binding or inuring to the benefit of the landlord thereunder shall, in respect of this Sublease, bind or inure to the benefit of Sublessor, and each and every term, covenant and condition of the Main Lease binding or inuring to the benefit of the tenant thereunder shall, in respect of this Sublease, bind or inure to the benefit of Subtenant, with the same force and effect as if such terms, covenants and conditions were completely set forth in this Sublease, and as if the words "Lessor" and "Lessee," or words of similar import, wherever the same appear in the Main Lease, were construed to mean, respectively, "Sublessor" and "Subtenant" in this Sublease, and as if the words "Leased Premises," or words of similar import, wherever the same appear in the Main Lease, were construed to mean "Subleased Premises" in this Sublease, and as if the word "Lease," or words of similar import, wherever the same appear in the Main Lease, were construed to mean this "Sublease." [Notwithstanding anything to the contrary contained in this Sublease, the provisions of sections_____ of the Main Lease are not incorporated in this Sublease.]

(a) The provisions of the Main Lease, as incorporated by reference in this Sublease, are modified as follows:

(1) If any of the express provisions of this Sublease shall conflict with any of the provisions incorporated by reference, such conflict shall be resolved in every instance in favor of the express provisions of this Sublease.

(2) If Sublessor receives any notice or demand from the Overlandlord under the Main Lease which may impact this Sublease, Sublessor shall promptly, and in any event, by the following business day, give a copy thereof to Subtenant.

(3) Notwithstanding anything to the contrary, Sublessor agrees and covenants to abide by all the terms of the Main Lease, as modified herein, and otherwise agrees that the term of the Sublease will not be disturbed, and should for any reason Overlandlord step into the shoes of Sublessor due to non-performance, default or otherwise, Subtenant agrees to attorn to Overlandlord and recognize it as its landlord under the terms of this Sublease.

4. <u>PERFORMANCE BY SUBLESSOR</u>.  Any obligation of Sublessor which is contained in this Sublease by the incorporation by reference of the provisions of the Main Lease may be observed or performed by Sublessor causing Overlandlord (at Sublessor's sole cost and expense) to observe and/or perform the same.  If Sublessor is unable to cause Overlandlord to observe and/or perform same by making reasonable requests of Overlandlord, then Sublessor shall commence and diligently prosecute all appropriate litigation and appeals against Overlandlord, at Sublessor's sole cost and expense, and agrees upon reasonable notice, to reimburse Subtenant for all reasonable fees, costs and expenses incurred as a result. Sublessor agrees to timely perform all of Sublessor's obligations under the Main Lease, including without limitation Sublessor's obligation to pay the rent, additional rent and all other sums due under the Main Lease except to the extent that such obligations are to be performed by Subtenant under this Sublease.

5. <u>RENT</u>.  Subtenant shall pay to Sublessor rent (the "<u>Fixed Rent</u>") at the rate of $1.00 per month, payable in advance on the first day of each month during the term of this Sublease. Subtenant shall not be required to pay to Sublessor any additional rent or any other costs imposed on Sublessor pursuant to the Main Lease.

6. <u>SECURITY</u>.  Subtenant shall not be required to deposit any security under this Sublease.

7. <u>UTILITIES</u>.  Sublessor shall pay for all utilities furnished to the Subleased Premises except to the extent same are furnished to Sublessor without charge under the Main Lease.

8. <u>INSURANCE</u>.  Subtenant shall maintain throughout the term of this Sublease comprehensive general public liability insurance in respect of the Subleased Premises and the conduct and operation of business therein, with Sublessor, Overlandlord and any other party required under the Main Lease as additional insured, with limits of not less than $1,000,000 for bodily injury or death to any one person and $2,000,000 for bodily injury or death to any number of persons in any one occurrence, and $100,000 for property damage.  Subtenant shall deliver to Sublessor a certificate of insurance indicating such coverage prior to the Effective Date.  Subtenant

shall procure renewals or replacements of such insurance from time to time before the expiration thereof, and Subtenant shall deliver to Sublessor certificate of insurance indicating such coverage before the expiration of any existing policy.  All such policies may be effected under blanket policies of insurance and may contain Subtenant's standard deductibles of self-insurance.

9.  <u>WAIVER OF SUBROGATION</u>.  Sublessor and Subtenant each hereby release the other from liability for damage or destruction to the Subleased Premises, whether or not caused by acts, negligence or omissions of the other party; provided, however, such release shall only be in force and effect in respect of damage or destruction normally covered by standard policies of fire insurance with extended coverage (whether or not such coverage is in effect).  Each party shall cause its fire insurance policies to contain a provision whereby the insurer either waives any right of subrogation against the other party or agrees that such a release shall not invalidate the insurance, whichever is obtainable.  Subtenant hereby releases Overlandlord and anyone claiming through or under Overlandlord by way of subrogation or otherwise to the extent that Sublessor released Overlandlord and/or Overlandlord was relieved of liability or responsibility pursuant to the provisions of the Main Lease, and Subtenant will cause its insurance carriers to include any clauses or endorsements in favor of Overlandlord and others which Sublessor is required to provide pursuant to the provisions of the Main Lease.

10. <u>USE</u>.  Subtenant shall use and occupy the Subleased Premises solely for any use permitted under the Main Lease.

11. <u>CLASSIFIED INFORMATION IN SUBLEASED PREMISES</u>.

(a)  Sublessor, on behalf of itself, its officers, employees, agents, customers and/or invitees, in their capacity for and on behalf of Sublessor, (a) shall comply with any and all security safeguards, restrictions, protocols and controls put in place by Subtenant at the Subleased Premises in connection with any documents or information in Subtenant's respective possession, custody or designated by Subtenant in their sole discretion as classified (collectively, the "<u>Classified Information</u>") and access thereto; (b) shall not access, seek access, or require access to the Classified Information or grant access to the Classified Information to any third party; and (c) shall be formally excluded from (i) any Classified Information and (ii) all "Set B" rooms and other rooms in which Subtenant are authorized to store Classified Information that may be located within the Subleased Premises.

(b) Without limiting any of the foregoing, Sublessor and Subtenant, on behalf of themselves and their respective officers, employees, agents, customers, and/or invitees, hereby agree that they shall comply with any and all requirements for the security of Classified Information at the Subleased Premises as may be required by the U.S. Government including but not limited to: (1) applicable security and safeguards requirements under 32 C.F.R. § 117.15; and (2) the Security Controls provisions of the DD 441 security agreements executed in connection with the Cleared Contracts, as well as the contract security classification specifications found in DD 254.

12. <u>ALTERATIONS</u>.  Subtenant shall not make or cause, suffer or permit the making of any structural alteration to the Subleased Premises without obtaining the prior consent of Sublessor in each instance, such consent not to be unreasonably withheld, conditioned or delayed.

Notwithstanding, Subtenant may make any non-structural changes to the Subleased Premises without the consent of Sublessor.

13. <u>ASSIGNMENT AND SUBLETTING</u>.  Subtenant shall not, by operation of law or otherwise, including pursuant to 11 U.S.C. § 365, assign this Sublease or sublet the Subleased Premises or any part thereof without the consent of Sublessor which may not be unreasonably withheld, conditioned or delayed.

14. <u>Intentionally Omitted.</u>

15. <u>CONSENTS AND APPROVALS</u>.  In any instance when Sublessor's consent or approval is required under this Sublease, Sublessor agrees not to unreasonably withhold, condition or delay such consent or approval. Should any consent(s) be required of Overlandlord, Sublessor agrees to obtain such consent expeditiously, using all commercially reasonable means.  Sublessor represents to Subtenant that it has obtained Overlandlord's consent to this Sublease.

16. <u>DEFAULTS</u>.  In the event of any default under this Sublease by Sublessor or Subtenant, the defaulting party shall have a period in which to cure such default equal to:  (a) ten (10) days after notice of such default if such default shall relate to the payment by Subtenant of any Fixed Rent or other sum due under this Sublease or the payment by Sublessor of any sum due under this Sublease or any fixed rent, additional rent or other sum due under the Main Lease; or (b) for all other matters, thirty (30) days after notice of such default, unless such default shall be of a nature that it cannot reasonably be cured within such thirty (30) day period, in which event the defaulting party shall have a reasonable period of time in which to cure such default provided that the defaulting party shall commence to cure such default within such thirty (30) day period and shall thereafter diligently prosecute such cure to completion.

17. <u>INDEMNIFICATION</u>.  Notwithstanding anything to the contrary contained herein, including Article 9 hereof, both Sublessor and Subtenant, agree, to defend, indemnify and hold the other harmless against any costs, demands, claims, sums of money, damage or otherwise that may be incurred under the terms of this Sublease (except to the extent covered by insurance) except to the extent caused by the negligence, intentional acts or omissions of the party requesting such indemnification.

18. <u>NOTICES</u>.  All notices, consents, approvals, demands and requests which are required or desired to be given hereunder shall be given in accordance with the provisions of Section 10.7 of the Transition Services Agreement.  All notices, consents, approvals, demands and requests which are required or desired to be given to Sublessor or Subtenant hereunder shall be given by electronic mail transmission or mail to the chief executive officer of the other party (attention: CEO) at the email or mailing address indicated in the signature block hereto, or such other address or email address as such party may hereafter specify for the purpose by notice to the other parties. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

19. <u>TERMINATION OF MAIN LEASE</u>.  If for any reason the term of the Main Lease

4

shall terminate prior to the expiration date of this Sublease, this Sublease shall thereupon either (a) be terminated and Sublessor shall not be liable to Subtenant by reason thereof, upon no less than thirty (30) days' notice to Subtenant; or (b) at the election of Subtenant, attorn to and recognize Overlandlord as its landlord under the terms of this Sublease, whereupon, the remainder of the term herein of Subtenant will not be disturbed.

20. <u>NO WAIVER</u>.  The failure of Sublessor or Subtenant to insist in any one or more cases upon the strict performance or observance of any obligation of the other party hereunder or to exercise any right or option contained herein shall not be construed as a waiver or relinquishment for the future of any such obligation of the other party or any right or option of the other party.

21. <u>COMPLETE AGREEMENT</u>.  There are no representations, agreements, arrangements or understandings, oral or written' between the parties relating to the subject matter of this Sublease which are not fully expressed in this Sublease, except as set forth in the Transition Services Agreement and the Sale Order.  This Sublease cannot be changed or terminated orally or in any manner other than by a written agreement executed by both parties.

22. <u>SUCCESSORS AND ASSIGNS</u>.  The provisions of this Sublease, except as herein otherwise specifically provided, shall extend to, bind and inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and permitted assigns.

23. <u>INTERPRETATION</u>.  Irrespective of the place of execution or performance, this Sublease shall be governed by and construed in accordance with the laws of the State in which the Subleased Premises are located.  If any provision of this Sublease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Sublease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.  The table of contents, captions, headings and titles, if any, in this Sublease are solely for convenience of reference and shall not affect its interpretation.  This Sublease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Sublease to be drafted.  If any words or phrases in this Sublease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Sublease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Sublease and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated.  Each covenant, agreement, obligation or other provision of this Sublease shall be deemed and construed as a separate and independent covenant of the party bound by, undertaking or making same, not dependent on any other provision of this Sublease unless otherwise expressly provided.  All terms and words used in this Sublease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.  The word "<u>person</u>" as used in this Sublease shall mean a natural person or persons, a partnership, a corporation or any other form of business or legal association or entity.

24. <u>CONSENT OF LANDLORD UNDER MAIN LEASE</u>.  As set forth in Paragraph 1 of this Sublease, this Sublease shall have no effect unless and until Overlandlord shall have given its written consent hereto in accordance with the terms of the Main Lease or unless and until approved pursuant to the Sale Order; and any conditions precedent with respect to such consent have been

satisfied or waived. If Overlandlord refuses to give its Consent to this Sublease and the Sublease is not approved pursuant to the Sale Order, this Sublease shall be deemed null and void and of no effect.  If such consent of Overlandlord is not provided within _____days of the date of this Sublease, this Sublease may be terminated by either party upon written notice to the other and shall be of no further force and effect.

[*Signatures on the Following Page(s)*]

IN WITNESS WHEREOF, Sublessor and Subtenant have executed this Sublease as of the day and year first above written.

SUBLESSOR:

**PAGE SOUTHERLAND PAGE, INC.**

By:_____
Name: Thomas McCarthy
Title: Senior Principal

SUBTENANT:

**EYP, INC.,**
a Massachusetts corporation

By:_____
Name: Kefalari Mason
Title: Authorized Officer

## <u>CONSENT</u>

This Sublease is hereby consented to as of this **___** day of **_____**, 2022, by the undersigned as Overlandlord.

[NAME OF OVERLANDLORD]

By:_____

Name:_____
Title:_____

Schedule A

FLOOR PLAN OF SUBLEASED PREMISES

[To be inserted.]